1814.

COMMON-
WEALTH
*v.*
LEWIS.

Judgment for the plaintiff.

## √ The Commonwealth *against* SHEPHERD.

Philadelphia,
Monday,
April 4.

THE defendant was indicted for fornication with one Sarah *Myers*, and begetting a bastard child on her body; and upon the trial before *Yeates* J. in *July* last, he was convicted. The defendant now moved for a new trial, and his honour reported that the case was as follows:

Sarah *Myers* the prosecutrix was married in the year 1801. She lived with her husband two or three years after the marriage, when he went off to *New York* where he had resided ever since. Her father *James Humphreys* took her back to his own house in *Kensington*, and she had uniformly dwelt under his roof, except during three short intervals, in the latter end of 1811, and the following spring, when she was absent from her father's house about three months, engaged as a nurse at different places. Upon these occasions the defendant frequented her company, was with her late at night when the families had gone to bed, and once was with her all night. Her husband on the 17th of *March* 1805, came to her father's house and supped, but did not sleep there. Since that time he had not been known to be in the company of his wife either at her father's house or elsewhere; but one witness swore that he saw *Myers* in the *Philadelphia* market on the 10th of *June* 1812, and he was seen in the same place about a month before, and also in the spring of 1811.

The prosecutrix having been called, swore that she was delivered of a male child on the 24th of *December* 1812,

*If the husband has access to his wife, no evidence short of his absolute impotence can bastardize the issue; but if they live at a distance from each other, so that access is very improbable, the question of legitimacy may be decided on a consideration of all the circumstances.*

*Upon an indictment for fornication and bastardy, a married woman is a competent witness to prove the criminal connexion with her.*

*The wife cannot prove the non-access of the husband; but if the Court permit her to be asked a question from the answer to which non-access may be inferred, as "how long it was since she had "seen her husband," and afterwards instruct the jury that they were not to consider any thing which fell from*

the wife as evidence of non-access, the verdict cannot be disturbed on account of the question.

that the defendant promised to marry her, had frequent criminal connexion with her, and was the father of the child.

It had not appeared when she gave this evidence, that she had ever been married. The defendant's counsel put that question to her on the cross examination, and she answered that she was married about Christmas 1801, but that she did not know whether her husband was dead or not. The counsel for the prosecution then asked, *when she last saw her husband.* The defendant's counsel objected, and after a long discussion the judge overruled the objection, and she answered that she had not seen him for eight years.

In his charge to the jury, *Yeates* J. said, that if upon a consideration of all the evidence, they should be of opinion that the husband had not had access to his wife, and that the child was really begotten by the defendant, they might find him guilty of both fornication and bastardy; but that they were not to consider any thing which fell from *Sarah Myers* as evidence of non-access.

*Browne* for the defendant.

1. The verdict was against law and evidence. The husband had been seen in *Philadelphia,* several times after he removed to *New York,* and particularly in *May* and *June* 1812; and no evidence was given to shew that he was in *New York* at the time when the child was begotten. Access was to be presumed, until the contrary was shewn. Although the rule of the four seas is exploded, yet it is still the law that if the husband is in the same place with his wife, the issue shall be bastardized only by proof of his impotence. It is not necessary that he should be in her company. Access does not mean connexion, but liberty to have connexion. *Lomax* v. *Holmden* (*a*), is in point. 1 *Bac. Ab.* 511. *Bast. A.,* 1 *Botts Poor L.* 396. 397., 1 *Tucker's Black.* 457., *Rex* v. *Reading* (*b*), 1 *Domat* 622. It was the duty of the prosecution to rebut the presumption of access, by proof of non-access, and so should the judge have charged; whereas from his charge to the jury, they must have understood that there was no such presumption in favor of access. *St. George* v. *St. Margaret* (*c*). *Peake's Ev.* 420.

(*a*) 2 *Stra.* 940.   (*b*) *Hardw. ca.* 79. (73).   (*c*) 1 *Salk.* 123.

2. Illegal evidence was admitted. It is perfectly settled that the wife cannot prove the non-access; and yet the answer to the question went to shew non-access; for it is a mere play upon words, to say that a wife may not see her husband, and yet he may have access to her. The effect of this answer remained, notwithstanding what the judge said in his charge, and we are entitled to go to a jury who shall not hear that question or the answer. The wife herself was not a competent witness to the bastardy; she has no right to release her husband from the responsibility of maintaining her issue, nor to affect his reputation by her testimony. The act of 1705 applies only to cases of single and unmarried women; this case stands at common law. *Drowne* v. *Stimpson* (a) is a strong authority.

*Ewing* for the prosecution.

1. The law is now settled that access or non-access may be proved by circumstances. *Pendrell* v. *Pendrell* (b). It was therefore properly stated to the jury; and no one can doubt from the evidence, that their inference from it was right.

2. The question was put to the witness, after she had been asked if she had been married, and she had answered that she did not know whether her husband was dead or alive. It went to corroborate this statement. But if it was improper because it tended to shew non-access, that tendency was counteracted by the charge. The wife is a good witness to prove the connexion, *ex necessitate;* but the non-access must be shewn by other witnesses. This is the result of all the cases. 1 *Botts* 455. *pl.* 600. *Rex* v. *Reading* (c), 1 *Botts* 462. *pl.* 607. 397. *pl.* 593. 452. *pl.* 593. The exception to her testimony is now too late, it should have been taken at the trial before the verdict was brought in. *Hecker* v. *Jarret* (c).

Tilghman C. J. This is a motion for a new trial by *William Shepherd*, who has been convicted of fornication with *Sarah Myers*, and begetting a bastard child on her body. The reasons assigned are, that the judge who tried the cause admitted improper evidence, and erred in his

1814.
COMMON-
WEALTH
*v.*
SHEPHERD.

(a) 2 *Mass.* 441.
(b) 2 *Stra.* 925.
(c) *Andrews* 10.
(d) 3 *Binn.* 404.

1814.

COMMON-
WEALTH
*v.*
SHEPHERD.

charge to the jury. Also that the verdict was against the evidence.

*Sarah Myers* was a married woman. Her husband had left her some years previous to the birth of the bastard child; he lived in *New York*, and she in *Kensington* near *Philadelphia*. The judge charged the jury, that if on consideration of all the evidence, they should be of opinion that the husband had no access to his wife, and that the child was really begotten by the defendant, they might find him guilty of both fornication and bastardy. In this he was clearly right. In old times it seems to have been holden, that a child born of a married woman, whose husband was within the four seas which bounded the kingdom, could not be considered as illegitimate. This was unreasonable. When the husband has access to his wife, it is right that no evidence, short of absolute impotence of the husband, should bastardize the issue. But where they live at a distance from each other, so that access is very improbable, the legitimacy of the child should be decided upon a consideration of all circumstances. The law was so laid down in *Pendrell* v. *Pendrell* in the fifth year of *George the second*, 2 *Stra.* 925, and has ever since been considered as settled.

With respect to the evidence admitted at the trial, it is objected, first, that *Sarah Myers* was not a competent witness, and secondly, that granting her to be such, she ought not to have been asked, " how long it was since she had seen " her husband." The first objection is founded upon a supposition, that her evidence was received under our act of assembly, which provides, that a man may be convicted of bastardy on the oath of the mother of the child, *being a single woman*. My brother *Yeates*, before whom the cause was tried, mentions the case of *Doctor M'Clean*, against whom a married woman was admitted as a witness after full argument, and the law as he conceives has been so taken ever since. *M'Clean's* case was before my memory, but I have no doubt of its being decided on correct principles; because, throwing the act of assembly out of the question, the woman would be a competent witness from the *necessity* of the case, upon *common law principles*. I do not mean that she would be a witness to all purposes, but only as far as the necessity extends, that is to prove the *criminal connexion*.

Further than that she ought not to go; because every thing else is capable of proof by other persons, and nothing but necessity will warrant the dispensing with the rule, that a woman shall not be a witness in a matter wherein her husband is concerned; and here he is very much concerned, both in property, (for he is bound to maintain the child if it be legitimate) and in character. That the wife may be a witness to the extent I have mentioned, and no further, I consider as well established in the cases of The *King* v. *Reading*, *Cases Temp. Hardw.* 79, and The *King* v. The *Inhabitants of Bedel*, *Cases Temp. Hardw.* 379., 2 *Str.* 1076., *Andr.* 8. I should therefore be of opinion, that it was improper to ask " how long it was since the wife saw the husband," unless something which had been asked by the defendant's counsel on her cross examination, made way for it. Without some such circumstance, it would have been improper, because the answer, " that she had not seen her husband for eight " years," might go far towards proving his non-access, which it is not competent to her to prove, that being a matter capable of proof by others. The judge considered the questions put by the defendant on the cross examination, as making way for the question objected to, viz. " when had she last " seen her husband." I think it unnecessary to consider that matter, because the judge afterwards expressly charged the jury, that they were not to consider any thing which fell from *Sarah Myers* as evidence of non-access. The force of what she said, was therefore taken off, just as in the common case of a witness, who after being sometime examined is discovered to be interested in the cause, when the Court tells the jury, that all which had been said, is to go for nothing. But it is again objected, that it may not be in the power of the judge to remove from the mind of the jury, the impressions which the evidence had made. I answer that it is not to be supposed, that the jury will disregard the Court's direction in matters of law. Nor is there any reason to suppose they did so in this case, where there was strong evidence of non-access by other witnesses. It was proved that the husband had left his wife, and resided in *New York* for several years before the birth of the child; nor was the presumption of non-access resulting from this, encountered by evidence sufficient to shake it. There was

proof indeed, that the husband had been seen occasionally in *Philadelphia;* but not at or near the time, when this child was begotten. Had the case rested upon the evidence of the woman alone, I should have been decidedly for a new trial; but it appears to me, that without her testimony, the jury would have been warranted in concluding that there had been no access. Having said thus much, it is unnecessary to add any remarks on the remaining objection, of the verdict being against the evidence. Upon the whole my opinion is against a new trial.

YEATES J. I deem it my bounden duty to give an accurate statement of the evidence upon the trial of this indictment, the questions of evidence decided by me, and the grounds of my opinion upon the law arising out of the case. I shall pursue the order observed in the argument, by fairly reviewing all the testimony, and considering whether the verdict of the jury was against law and evidence. [His honour then stated the case at large.]

On this evidence, strengthened by the declarations of the woman in the extremity of her labour, that the defendant was the father of the child, the jury found the defendant guilty of the fornication and bastardy charged, after a few minutes consultation at the bar. The child had come to its full time, and no peculiar circumstances having attended the mother during the period of gestation, in the usual course of nature must have been begotten in *March* or *April* 1812. Of the non-access on the part of the husband at those times, there was strong evidence; and the many nocturnal indiscreet interviews of the defendant and prosecutrix, under the most suspicious circumstances, corresponding in point of time with the supposed period of the child's being begot, powerfully corroborated the testimony of the mother.

Upon the law of the case I charged the jury thus: Where man and wife live together as married people usually do, a third person may readily be convicted of fornication with the wife, but I know not how he could be convicted of bastardy with her, unless the bodily impotence of the husband could be fully and clearly established. Where they live separate or apart, it might be shewn either from facts or

1814.

COMMON-
WEALTH
*v.*
SHEPHERD.

circumstances, that the husband had not access to the wife; but the law was not so unreasonable as to demand proof of non-access, by witnesses who were with her every minute of the time, wherein she is supposed to have been begotten with child. If such facts and circumstances were proved, as would induce a rational well grounded belief that the husband could have had no access, it was in my opinion sufficient. Upon the point of access the jury were the proper judges in my opinion.

It has been contended by the defendant's counsel, that I was incorrect in this charge, inasmuch as nothing short of the absolute *impossibility of access*, will rebut the legal presumption of access in the conjugal state. To establish this position, *Lomax* v. *Holmden et al.*, 2 *Stra.* 940, was cited; but there the legitimacy of the lessor of the plaintiff, was found by the jury, on the ground of the husband's being frequently at *London* where the mother lived, and the evidence of *inability* from a bad habit of body not going to an impossibility, but only an improbability. It is among the *arcana* of nature, to what extent debility of body must be shewn, to prevent procreation. It would puzzle the most skilful physicians to determine, unless in extreme cases, this particular. The case of the parishes of *St. George* and *St. Margaret's Westminster*, 1 *Salk.* 123, was much relied on. It was there held, that a child begotten after a divorce a *mensa et thoro*, shall be taken as a bastard; but if *baron* and *feme* without sentence past, part and live separate, the children shall be taken to be legitimate, and so deemed until the contrary be proved, *for access shall be presumed.* If it is understood by this case, that a husband constantly residing in one place remote from his wife, shall be presumed to have access, it is as rank as the exploded doctrine of the four seas, and partakes of all its absurdity. And it is obvious that a separation of man and wife, arising from mutual disgust and aversion, will operate as powerfully against a re-union, as the temporary divorce of a court of justice. This decision took place 5 *Anne;* but in *Pendrell* v. *Pendrell*, 2 *Stra.* 925, (5 *Geo.* 2), the law underwent a change, and was finally settled on principles of sound reason. It was there agreed both by court and counsel, that the presumption of legitimacy of a child born during marriage, might be encountered by evi-

dence of non-access; and the jury were at liberty to consider of the point of access, which they did in that case, and found against the son claiming as heir.

In 1734, in *Sidney* v. *Sidney*, 3 *Pr. Wms.* 275, Lord Chancellor *Talbot* considers this doctrine as fully established, and such I take to have been the received opinion in the courts of law of this government, for more than half a century.

It has been further contended, that illegal testimony was received during the trial. I overruled without hesitation the declarations of the husband respecting the relative situation of himself and his wife, previous to and in the month of *June* 1812; and also the opinions of the neighbours as to the legitimacy of the child, and the improper intimacies of the defendant with the mother. The defendant's guilt was to be ascertained, not by the declarations of the husband or the opinions of others, but by facts established upon oath. Of these decisions the defendant's counsel does not complain; but insists that the wife ought not to have been admitted as a witness, and also that an improper question was suffered to be asked of her. It is a sufficient answer to the first objection, that no exception was taken to her testimony in any stage of the cause, and now it comes too late, according to the opinion of the Court in *Hecker* v. *Jarrett*, 3 *Binney* 404. But independently thereof, I have no difficulty in asserting, that she was a competent witness, from the necessity of the case. No one but the mother could ascertain who was the father of her child; such criminality, from the imperious law of nature, is perpetrated *secretly*. The opinion of this Court upon full argument in *The King* v. *Laughlin M'Clean*, a case of great notoriety some years before the *American* revolution, fully established the competency of the wife (Mrs. *Osbourne*) in cases of this nature, and many instances have occurred wherein that precedent has been followed. Such also is the practice in *England*, under orders of filiation of the bastard children of married women.

A detail of facts is necessary to ascertain, whether the question proposed to *Sarah Myers* was proper or not. After testifying what I have before stated, several pointed questions were proposed to her by the defendant's counsel. It was not disclosed in the first instance whether she was

a married or unmarried woman. Upon her cross examination, she declared that she was once married about the Christmas of 1801, and that she did not know whether her husband was then living or dead? The counsel for the prosecution then asked her, *when did you see your husband last?* This was objected to upon the defendant's part, and pertinaciously adhered to by the counsel who proposed it. I early expressed my opinion that the mother could not be received as a witness to bastardize her issue, by swearing that the husband had not access to her. The question was still persisted in, and a lengthy argument ensued which put my patience to the test. I observed " that it was unneces- " sary in that stage of the cause to decide, whether when " other witnesses had sworn to circumstances which went " to prove a want of access, the wife might not be examined " thereto, (*See Cas. Temp. Hardw.* 82, 83. *Rex* v. *Reading*, " 8 *Geo.* 2.), though she could not be the sole witness. " *There might have been access, although the wife did not* " *see her husband;* and the question did not appear improper " to me, from the questions which had been put to her by " the defendant's counsel." Upon my deciding on the question, the witness answered, that *she last saw her husband upon the* 17*th of March* 1801.

I readily disclaim all pretensions in the reason I first gave, as to the access of the husband, to a *pun* or *witticism*, which has been facetiously ascribed to me by the ingenious counsel for the defendant. I have not sufficient penetration to discover one single trait or feature of resemblance however *clumsy*, which may entitle the remark to either of those denominations. I simply meant to convey the idea, that her answer could not *necessarily* prove want of access of the husband. Although I admit, that one cannot have the effect of evidence *in obliquum*, which he cannot use *ex directo*, yet it is obvious that a married woman swearing to a third person being the father of her child, does *indirectly* convey the idea of the want of access of the husband, who has separated from her company for years, at least *pro hac vice*. Such however is the common practice, both here and in *England*. But there is another ground upon which the question put to the witness may be justified in my idea. The answer thereto went in corrobora-

tion of her former assertion to the defendant's question, that she did not know whether her husband was then living or dead. Thus to shew the consistency of a witness, what he has been heard to say without oath at another time, may be given in evidence in support of his testimony, or to discredit him; yet singly, and of itself, such hearsay would be inadmissible.

It has been remarked, that it would be highly dangerous to admit testimony, which may have an operation on the minds of jurors, and then to tell them they shall pay no regard to it. But the law intends that jurors pay respect to the charge of the Court, and we know that the fact corresponds with this presumption. The same observation may be made, where it turns out upon a cross examination, that a witness who has been sworn is found out to be interested, and the jury are told that they should pay no regard to his testimony before given. Here it was early announced, that the wife's testimony could not be available to prove the non-access of her husband; and the jury were expressly charged, that they should lay no stress on her answer of not having seen her husband for above eight years, as disproving his access.

I fear I have been tedious, but I have been compelled thereto. I hasten to observe that I see no ground either in law or fact, which would justify us in disturbing this verdict.

BRACKENRIDGE J. concurred with the Chief Justice.

Judgment for the Commonwealth.