STEFFENS (UNITED STATES v.). See Case No. 16,384.

## Case No. 13,351.

STEGALL et al. v. STEGALL et al.

[2 Brock. 256.] [1]

Circuit Court, Virginia.[2] June 22, 1825.

DOWER—FORFEITURE—LEAVING HER HUSBAND—OPEN ADULTERY—PERSONAL ESTATE—UTERINE BASTARDY — PRESUMPTIONS — TESTIMONY OF MOTHER—ISSUE TO TRY LEGITIMACY.

1. Under the act of assembly of Virginia (1 Rev. Code, c. 107, § 10), which declares, that if a wife willingly leave her husband, and go away and continue with the adulterer, she shall forfeit her dower, &c.; that part of the provision which relates to her willingly leaving her husband, is satisfied by any separation which is voluntary on her part: and any separation is voluntary which is not brought about by the husband's act, or by some constraint on her person. Therefore, where the husband wished his wife to accompany him, and she refused, although her parents objected to her going, and she excused herself on that ground, and because of reports that he was married to another woman, the separation must be considered voluntary on her part.

2. The words "and go away and continue with the adulterer," are satisfied by an open state of adultery, whether the woman reside in the same house with the adulterer, or in another house; whether in her own, or a friend's house, or his; or whether with or without the ceremony of marriage; in either case, she forfeits dower.

3. The claim of the wife to a distributive share of her husband's personal estate, stands on a different ground; her right to it under the statute of distributions is absolute, and she does not forfeit it by her conduct, however unworthy (1 Rev. Code, c. 104, § 29); and the court of equity is bound to carry this statute into effect, though the conduct of the claimant in equity has been reprehensible.

4. The presumption of law is in favour of the legitimacy of a child born in wedlock; but this presumption may be rebutted by other testimony. It is true that a mere probability of non-access by the husband, is not sufficient to repel the presumption; but it is not necessary for the party objecting to the legitimacy, to prove that non-access was impossible. If the evidence places the non-access beyond all reasonable doubt, it is sufficient to repel the presumption of legitimacy.

[Cited in Egbert v. Greenwalt, 44 Mich. 250, 6 N. W. 654; Watkins v. Carlton, 10 Leigh, 567.]

5. If a man marries a woman in such an advanced state of pregnancy, that the situation of his wife must have been known to him, it must be considered as a recognition of the child, afterwards born, as his own; any conduct of the husband after the birth, indicating a belief that the child is his, is decisive. But where the marriage takes place where the pregnancy is probably unknown; where the acquaintance between the parties most probably commenced too late for the husband, according to the law of gestation, to be the father of the child afterwards born; where the common opinion of the neighbourhood assigns the child to another man;

where the boy grows up, not in the house of the husband of the woman, nor looking on him as a father, nor being considered as a son, and the reputation of the woman is not good; these are all circumstances which go strongly to repel the presumption of legitimacy.

[Cited in Dennison v. Page, 29 Pa. St. 422.]

6. A court of equity should direct an issue to try the fact of legitimacy, where the circumstances above narrated are supported by the depositions in the cause.

7. The unsworn declarations of the mother, that her son, born six months after marriage, is the son of another man, are not admissible to prove his illegitimacy, and, a fortiori, the declarations of that man are not admissible; if their evidence is proper, their depositions should have been taken.

8. The general report of the neighbourhood on the question of legitimacy, is not to be disregarded, but its weight depends on the circumstances of the case, on the remoteness of the time when the fact occurred, and the difficulty of producing any positive evidence respecting it.

In equity.

MARSHALL, Circuit Justice. This suit is brought by Catharine Stegall, widow of John Potter Stegall, deceased, and by James Wright, and Martha his wife, and Jordan R. Sherwood, which said Martha and Jordan, are the children of the plaintiff, Catharine, and claim to be the children of the said John Potter Stegall, deceased, against Beverly Borum, administrator of the said John Potter Stegall, and John Jennett, and Elizabeth his wife, and William Smith, and Nancy his wife, and Elisha Hodge, which said Elizabeth and Nancy claim to be the children of the said John Potter Stegall, by a subsequent marriage, and which said Hodge is the purchaser of Nancy Smith's portion of the real estate. The object of the suit on the part of Catharine Stegall is to recover her dower and distributive share of the personal estate of the said John Potter Stegall, and on the part of the other plaintiffs, to recover their just share of his lands and personal estate. The bill states the intermarriage of the plaintiff, Catharine, with the said John Potter Stegall, and their intercourse with each other, which, though they did not live together, was continued for some years, during which the plaintiffs Jordan and Martha, who are his children, were born, and that this intercourse was continued until it was broken off by his marriage with Susannah Portwood, the mother of the other defendants; that he continued to reside with the said Susannah until his death, which happened in the year 1818 or 1819; that Elizabeth was born before marriage, and is, consequently, illegitimate, not having been recognised, or if recognised, still illegitimate. The answers of the children of the second marriage, assert their legitimacy, and controvert the marriage of the plaintiff, Catharine, who, about the year 1800, intermarried with Henry Hill by whom she has sev-

[1] [Reported by John W. Brockenbrough, Esq.]

[2] [District not given.]

eral children. They also deny that the plaintiffs, Martha and Jordan, are the children of John Potter Stegall. The answer of the administrator states, that he has, in obedience to a decree of the county court, delivered over the slaves to the persons who were supposed to be the distributees.

As the claims of the several parties in this suit stand on distinct principles of law and fact, they will be separately considered; and, first, that of the plaintiff Catharine, who claims her dower in the land, and her distributive share of the personal estate of the deceased.

The facts that the plaintiff, Catharine Stegall, was the lawful wife of John Potter Stegall; that she lived separate from him in adultery with another man, to whom she was probably married, are satisfactorily proved. Her counsel, however, insist, that separation from her husband and her subsequent connexion with another man, are to be justified by the circumstances of the case. Her husband, it is said, was supposed to be married to another woman, and her parents would not permit her to accompany him. The words of the act of assembly are: "But if a wife willingly leave her husband, and go away and continue with her adulterer, she shall be barred forever of action to demand her dower, that she ought to have of her husband's lands, if she be convicted thereupon, except," &c. 1 Rev. Code 1819, p. 404, c. 107, § 10. So far as respects that part of the provision which relates to the wife's willingly leaving her husband, I think it is satisfied by any separation which is voluntary on her part; and I think any separation voluntary, which is not brought about by his act or by any restraint on her person. In this case, it does not appear that her person was restrained, and the authority of her parents ceased on her marriage. Her husband wished her to accompany him, and she refused. The separation must therefore be considered as voluntary on her part. The report that he was married with another woman does not justify her refusal to accompany him, because it was not true, in fact, and she ought not to have acted upon it. But if his real situation was such as to justify separation, it could not justify her subsequent conduct. That was incompatible with the continuance of her claims on him as a husband. The words, "and go away and continue with her adulterer," would, I am much inclined to think, be satisfied by an open state of adultery, whether the woman resided in the same house with her adulterer, or in separate houses; whether in her own or a friend's house, or in his; whether with or without the ceremony of marriage, which, in this case, is absolutely void, and which, if performed in the belief that her marriage with Stegall was a nullity, may justify that act to her own conscience, but cannot justify her claim to dower in Stegall's estate. I think it perfectly clear

that she is not entitled to dower in his lands.[3]

Her claim to a distributive share of his personal estate stands upon different ground. The act of assembly (1 Rev. Code, p. 382, c. 104, § 29, gives a lawful wife an absolute right to a portion of her husband's personal estate, and she does not forfeit that right by her conduct, however unworthy it may be. This court is, I think, as much bound by that act, as a court of common law would be. The principle, that a court of equity will not interfere in aid of a person whose conduct has been reprehensible in the particular case in which its aid is asked, applies, I think, to cases in which the party has a remedy at law; and if ever applied to one in which no remedy at law exists, it must be a right which originates merely in equity, and may therefore be withheld or granted according to circumstances; but a right given by a statute cannot, I think, be denied by a court of chancery, if it can be asserted in no other court. In such a case, a court of chancery can exercise no more discretion than a court of common law. The plaintiff, Catharine, is therefore entitled to her distributive share in John Potter Stegall's personal estate.

The next claim to be considered, is that of Jordan R. Sherwood, formerly Jordan R. Stegall, her eldest son, who was born six months after the marriage took effect. Being born in wedlock, he is legitimate, unless the conclusion of law can be met by such testimony, as according to principles settled in adjudged cases, is sufficient to repel it. There is no positive testimony showing the first acquaintance between the parties. Joseph Gill was well acquainted with Stegall, lived within three miles of Colonel Sherwood, the stepfather of Catharine, the plaintiff, with whom she resided, and does not recollect seeing Stegall in the neighbourhood before his marriage. Penelope Sherwood, her half-sister, was about three years old when the marriage took effect; and her recollection as to the length of time Stegall was at her father's house, cannot be accurate. Her present impressions must depend more on the statements she has heard in

---

[3] Lord Coke, in his commentaries upon St. Westm. II. c. 34, from which the section of our law quoted by the chief justice is taken, says: "If the wife elope from her husband, that is, if the wife leave her husband, and goeth away and tarrieth with her adulterer, she shall lose her dower until her husband willingly, without coercion ecclesiastical, be reconciled unto her, and permit her to cohabit with him, all of which is comprehended shortly in two hexameters:

'Sponte virum mulier fugiens et adultera facta,
Dote sua careat nisi sponsi sponte retracta.'

And if she goeth with or to the avowtrer, this is a departure and a tarrying, albeit she remaineth not continually with the avowtrer, or if she tarrieth with him against her will, or if he turn her away, or if she cohabit with her husband by the censures of the church, in all these cases she loses her dowry." 1 Thom. Co. Litt. 609, 610. See, also, 2 Co. Inst. 434.

the family, than on her positive memory. She would represent the first appearance of Stegall at the house, to have preceded the birth of Jordan about eight months. Polly Pinny represents the first visit of Stegall to have preceded the marriage five or six weeks, and the birth to have followed it seven or eight months. But the proof is satisfactory, that the marriage did not precede the birth more than six months, so that the first visit of Stegall to the family cannot have taken place more than seven, or at most, eight months before the birth of the plaintiff, Jordan, and there was no reason to suppose that the birth was premature. There is, however, no testimony that the acquaintance between the parties commenced with this first visit, and although Stegall lived in Halifax county, in Virginia, about sixty or seventy miles from the residence of Catharine Newby, in Franklin county, in North Carolina, yet the presumption that he had no access to her before this visit, is not so violent as to contradict the conclusion which the law draws from the marriage, unaided by other circumstances. This presumption, however, is supposed to derive considerable strength from the testimony, that according to the reputation of the neighbourhood, Jordan was the son of William·Bowers; that Bowers claimed him, and that Catharine herself said that he was the son of Bowers. If the declaration of the mother is admissible testimony, it would be entitled to great weight, if it should not be conclusive; but the counsel for the plaintiff contends, that these declarations are inadmissible. In arguing this point, the admissibility of the mother, as a witness, has been affirmed by the defendants and denied by the plaintiffs; but I think it unnecessary to decide this point, because the question before the court does not, I think, depend upon it. If the mother could not be received as a witness, it follows that her declaration cannot be received as testimony against her son; and if she could be received as a witness, then her deposition ought to have been taken.[4]

It is said, that hearsay is good evidence in cases of pedigree, and in cases of legitimacy; but it is the hearsay of persons who are dead, or whose testimony is unattainable. There is, I think, no case in which the declaration of one person can be admitted as evidence against another, when that person may be examined as a witness. I am compelled, therefore, to reject the declarations of the mother, whatever may be my private confidence in their truth. The same principle applies to the declaration of Bowers, who is not proved to be dead, and who could, perhaps, go no further than to state his chance of being the father of the boy.

The general report of the neighbourhood, cannot be entirely disregarded; but the weight to which this, and all other hearsay testimony is entitled, depends on the circumstances of the case. Hearsay is admitted only from necessity; and its weight must depend on the circumstances of the case, and much on the remoteness of the time when the fact occurred, and the difficulty of producing any positive testimony respecting it. The supreme court has said, in the case of Mima Queen v. Hepburn, 7 Cranch [11 U. S.] 290, that it will not extend the exceptions to the rule that hearsay is inadmissible further than they have been already carried.[5]

The result of the whole testimony is, that the presumption that Jordan is not the son of John Potter Stegall, is strong; but not so strong as to approach impossibility. It becomes, necessary, therefore, to inquire what degree of improbability has been considered by courts, as sufficient· to overrule the conclusion of law.

The plaintiffs contend that the rule must prevail, unless there be a physical impossibility, that the husband can be the father. The defendants insist that the ancient rule is relaxed, and that the facts, like most others determinable by human tribunals, must depend on probabilities, and on the comparative weight of testimony. Mr. Blackstone, in his Commentaries (volume 1, p. 457), says: "That children born during wedlock, may, under some circumstances, be deemed illegitimate; as if the husband be out of the kingdom." "But, generally, during the coverture, access of the husband shall be presumed, unless the contrary be shown, which is such a negative as can only be proved by show-

---

[4] Mr. Selwyn, in his treatise on the Law of Nisi Prius, under the head of "Legitimacy," title, "Ejectment," says, that "the wife is a witness of necessity as to the fact of adulterous intercourse, because that lies within her own knowledge, and she is the only person who may be supposed privy to it, except the adulterer. This case, therefore, affords an exception to the general rule, which prohibits the wife· from being examined against her husband, in any matter affecting his interest or character. But nonaccess must be proved by other testimony than that of the wife, and this rule holds, though the husband be dead." So, in Com. v. Shepherd, 6 Bin. 286, Chief Justice Tilghman said, that "the woman" (the husband, in that case, being alive, or not shown to be dead) "would be a competent witness, from the necessity of the case, upon common law principles. I do not mean that she would be a witness to all purposes, but only as far as the necessity extends, that is, to prove the criminal connexion. Further than that, she ought not to go; because every thing else is capable of proof by other persons, and nothing but necessity will warrant the dispensing with the rule, that a woman shall not be a witness in a matter wherein her husband is concerned," &c. "That the wife may be a witness to the extent I have mentioned and no farther, I consider as well established in the cases of Rex v. Reading, Cas. t. Hardw. 79, and Rex v. Inhabitants of Bedel, Id. 379, 2 Strange, 1076, Andrews, 8."

[5] [Mima Queen v. Hepburn] 7 Cranch [11 U. S.] 290; 2 Pet. Cond. R. 496. Reviewed and confirmed in Davis v. Wood, 1 Wheat. [14 U. S.] 6; 3 Pet. Cond. R. 465.

ing him to be elsewhere; for the general rule is 'presumitur pro legitimatione.' After a divorce, a mensa et thoro, the children are bastards; but in a voluntary separation by agreement, the law will suppose access, unless the negative be shown." Mr. Blackstone goes no further than to state the general presumption of law, and, consequently, that the onus probandi is thrown on him who would establish illegitimacy; but does not intimate that stronger testimony would be required to prove non-access, than in any other case of an alibi; in all which cases the degree of negative proof which is required, must depend, in some degree, upon the strength of the positive testimony. The fact of marriage, is the fact on which the plaintiffs rely as the positive testimony in this case; and it is the testimony on which the law erects the presumption of legitimacy; but it cannot be denied that a marriage, so early after conception, that the husband might not have discovered the pregnancy, does not afford so strong an inference in favour of his belief that he was the father of the child, as a marriage after the fact of pregnancy had become notorious. In Pendrell v. Pendrell, 2 Strange, 925, the husband and wife parted after living together some months. she staying in London, and he going to Staffordshire. After a separation of three years, the plaintiff was born, and it being uncertain whether the husband had visited London within the year, an issue at law was directed; and upon strong evidence of no access, the legal presumption in favour of legitimacy was overruled, and the law left to the jury, whose verdict was against the plaintiff. The case informs us that the evidence of no access was strong, but does not say what that evidence was. There is, however, no hint that it was such as to make access impossible. It is also observable that there was, probably, some doubt whether the husband had not been in London within the year. The circumstances are not fully stated in the case; but, so far as they are stated, there is no reason to suppose that there was any other proof of an alibi, than is afforded by the general residence of the husband in Staffordshire, and of the wife in London, without any testimony that he had visited London, or she Staffordshire. It is worthy of observation that evidence was admitted that the mother was of ill fame.

The case of Goodright v. Saul, 4 Durn. & E. [4 Term R.] 356, turns upon the legitimacy of John T. Hales, whose title was set up by the defendant. Elizabeth Tilyard, the great-grandmother of John T. Hales, had intermarried with Simon Kilburn, with whom she lived in Norwich some time without having any children. The husband then went away, after which, Elizabeth lived publicly with Joseph Hales, during which time a son, Joseph, was born, (from whom John T. Hales descended), who was always considered in the family as a bastard. It did not clearly appear where the husband was during this time, but one very old witness proved that he went to London, where it was supposed he remained, and returned to Norwich after the death of his wife. The son, Joseph, went by the name of Hales. The counsel for the defendant insisted on the presumption of law, in favour of legitimacy; and the judge instructed the jury, that though it was not absolutely necessary to prove the husband out of the realm in order to bastardize the issue, yet it was incumbent on the party insisting on that fact, to prove that the husband could not by any probability have had access to the wife at the time, which, he conceived, had not been shown in the present instance. The jury found for the defendant, and on a rule to show cause, a new trial was granted. Ashurst, J., said he was convinced he had laid too much stress on the necessity of proving non-access, when the husband was within the realm, by witnesses who could prove him constantly resident at a distance from his wife. That the husband in this case left the wife and went to reside at another place, as it was believed, in London, and that there was no direct evidence of his access: there was other evidence which went strongly to rebut the presumption of access; a very forcible circumstance was, that himself and his family had taken the name of his putative father. The instruction given to the jury in this case was, that it was necessary to prove that the husband could not, by any probability, have had access to the wife, and that the testimony did not amount to such proof. This instruction was declared to be erroneous, and must have been so either in its general principle, or in the particular application of the principle. The general principle was, that it was necessary to show that the husband could not, by any probability, not possibility, have had access to the wife; and the particular application of the principle was, to the case of living openly with another man, and having a son at the time, who was considered in the family as the child of that other man, and who took the name of the putative father. This case shows clearly, that without positive proof of non-access, circumstances may rebut the presumption arising from marriage.

The case of Rex v. Luffe, 8 East, 193, turned on the legitimacy of a child born in wedlock, where the proof of the non-access of the husband until within a fortnight of the birth, was positive. In the course of the trial, Lord Ellenborough said: "Where the thing cannot certainly be known, we must call in aid such probable evidence as can be resorted to, and the intervention of a jury must, in all cases in which it is practicable, be had to decide thereupon; but where the question arises, as it does here, and where it may certainly be known from the invariable course of nature, as in this case it may, that no birth could be occasioned and produced within those limits of time. we may venture to lay down the rule plainly and broadly, without any dan-

ger arising from the precedent." In giving his final opinion in the cause, the language of his lordship is much more positive. After stating cases which show that a natural incapacity of the husband to be the father, constitutes an exception to the rule of law, he adds: "And, therefore, if we may resort at all to such impediments, arising from the natural causes adverted to, we may adopt other causes equally potent and conclusive, to show the absolute physical impossibility of the husband being the father; I will not say the improbability of his being such, for upon the ground of improbability, however strong, I should not venture to proceed." "The general presumption," he also said, "will prevail, except a case of plain natural impossibility is shown." Justice Grose said: "In every case, we will take care, before we bastardize the issue of a married woman, that it shall be proved that there was no such access as could enable the husband to be the father of the child." Justice Lawrence said: "It had been shown that imbecility from age, and natural infirmity from other causes, have always been deemed sufficient to bastardize the issue, all which evidence proceeds upon the ground of a natural impossibility that the husband should be the father of the child. Then why not give effect to any other matter which proves the same natural impossibility?" Le Blanc lays down the old rule and says: "Afterwards, the rule was brought to this, that where there was an impossibility that the husband could have had access to the wife, and have been the father of the child, there it should be deemed illegitimate; and in Goodright v. Saul, the court held that there was no necessity to prove the impossibility of access, if the other circumstances of the case went strongly to rebut the presumption of access. If it do not appear, but that he might be the father, the presumption of law still holds in favour of the legitimacy." This is certainly a very strong case in favour of the opinion that positive proof of non-access is required to bastardize a child born in wedlock. The force of the decision, however, is in some degree diminished by two considerations; the first is, that access was clearly impossible. The question, therefore, was not whether illegitimacy might be proved where access was possible, but whether it was the legal consequence of the impossibility of access. When the judges proceeded to recognise the rule that legitimacy must be presumed where access was possible, they undoubtedly travelled out of the case before them; and although these obiter opinions are entitled to great respect, they do not stand on the same ground with opinions given on the very point which is decided. The second consideration is, that the case of Rex v. Luffe, was not a jury cause, but a case to be decided entirely by the court; and unless we suppose Lord Ellenborough to have changed his view of the case on hearing the whole argument, this circumstance was not without its weight; his language during the trial certainly countenances this idea. It is not entirely unworthy of remark, that though the chief justice and Grose, J., lay down the rule positively, Lawrence, J., avoids it, and Le Blanc, J., is not so explicit as the two whose opinions were first given.

This question is said in Phil. Ev. p. 118, to have been afterwards considered by the judges in the case of the Banbury Claim of Peerage, in which, Phillips says: "The principle laid down in the case of Goodright v. Saul, was affirmed." "It was held that where the husband and wife are not proved to be impotent, and have had opportunity of access to each other during the period in which a child could be begotten and born in the course of nature, the presumption of legitimacy arising from the birth of the child during wedlock, may be rebutted by circumstances inducing a contrary presumption; and the fact of non-access, (that is, the nonexistence of sexual intercourse,) as well as the fact of impotency, may always be proved by means of such legal evidence, as is strictly admissible in every other case where a physical fact is to be proved." I have searched in vain for a report of this case, and must, therefore, be content with the statement Phillips makes of it.[6]

The case of Bowles v. Bingham, 3 Munf. 599, is also a very strong case in favour of the presumption of law in favour of legitimacy, and the judge who delivered the opinion, unquestionably admits the law to be, that legitimacy must be presumed unless its impossibility be shown; but the same opinion shows that in the actual case, intercourse between the husband and wife at the time of conception, was probable, and the decision was in favour of the injured party.

The conclusion to which I am brought by a comparison of the cases I have had an opportunity of examining, is, that the presumption of law is in favour of the legitimacy of a child born in wedlock, but that this presumption may be rebutted by other testimony, which does not go to the full extent of absolute impossibility. I will not say that mere probability is enough; I think it is not enough; the known connexion of a woman with another man while she cohabited with her husband, or might, upon any reasonable calculation, be supposed to have intercourse with him, would weigh as nothing. In such case as this, if the marriage had taken place in such an advanced state of pregnancy, that the situation of the wife must have been known to the husband, I should be disposed to consider it as a recognition of the child afterwards born. Any conduct of the husband after the birth, indicating a belief that the child was his, would have been entitled to great weight, and

---

6 1 Wheat. Selw. N. P. (4th Am. from 7th London Ed.) p. 613.

would probably have been decisive; but in this case, the marriage took place when the pregnancy was probably unknown. The acquaintance between the parties, most probably commenced too late for the husband, according to the law of gestation, to be the father of the child afterwards born; the common opinion of the neighbourhood gave the child to another man; the boy grew up, not in the household of Stegall, not looking upon him as a father, not being considered as a son, and the presumption of law derives no aid from the reputation of the woman. Under all these circumstances, the court would be restrained from directing an issue, only by the opinion that the presumption of law must prevail, unless it be clearly impossible that the husband can be the father of the child. As I am not of that opinion, but think that this presumption of law may be rebutted by testimony which places the negative beyond all reasonable doubt, I shall direct an issue to try the legitimacy of the plaintiff, Jordan R. Sherwood.[7]

It will be unnecessary again to go through the law of the case in relation to the claim of Martha Wright. The probability that she is legitimate, is not stronger than that in favour of her brother, and I shall direct an issue as to her likewise. It will be unnecessary to discuss the rights of the defendants, until this issue shall be tried.

NOTE. The court directed that issues be made up and tried at the next term, to ascertain whether the plaintiffs, Martha Wright and John R. Sherwood were the children of John Potter Stegall, or not. At the November term of the court, 1825, the cause was continued until the next term, and leave given the parties ad interim, to take further testimony, each party giving due notice to the other of the time and place of taking the same. At the May term ensuing, a jury was empannelled to try the

---

[7] The opinion of Chief Justice Marshall, in the above case of Stegall v. Stegall, is fully sustained by the opinion of the supreme court of Pennsylvania, in the case of Com. v. Shepherd, 6 Bin. 286. That was a criminal prosecution against Shepherd for fornication with Sarah Myers, and begetting a bastard child by her. Sarah Myers, the prosecutrix, was married in 1801. She lived with her husband two or three years after the marriage, when he went away to New York, where he had resided ever since. The father of the prosecutrix took her back to his own house in Kensington, and she had, for the most part, uniformly resided under his roof. When absent, in 1811, and the following spring for three months, engaged as a nurse in different places, the defendant frequented her company, was with her late at night when the families had gone to bed, and once was with her all night. Her husband was not known to have been in her company for several years prior to the birth of the child, which took place, (by the testimony of the mother), on the 24th of December, 1812. But a witness swore that he saw Myers, the husband, in the Philadelphia market, on the 10th of June, 1812, and it appeared that he was seen at the same place, about a month before, and also in the spring of 1811. The prosecutrix also swore that the defendant had promised to marry her, had frequent criminal connexion with her, and was the father of the child. She did not know whether her husband was dead or not; and the

above issues and after very full argument, the jury not being able to agree on a verdict, were discharged. Another jury was empannelled at the December term, 1826, to try the same issues, and the case was again very laboriously argued, but this jury being also unable to agree upon a verdict, was likewise discharged. On the 6th day of June, 1827, the court, Marshall, C. J., and Hay. J., being present, on the motion of the plaintiffs set aside the order of June, 1825, directing issues to be made up and tried to ascertain the legitimacy or illegitimacy of the two plaintiffs, Martha Wright and Jordan R. Sherwood, and proceeded to render a decree, an extract from which is subjoined:

"The court is of opinion that the plaintiff, Catharine Stegall, formerly Catharine Newby, who was lawfully married to John Potter Stegall, now deceased, in the latter part of the month of December, 1789, was his, the said John Potter Stegall's lawful wife; but as it is in proof, that the said Catharine willingly left her said husband, and for many years before, and at the time of his death, lived in adultery with another man, she is, for that cause, by the act of assembly of Virginia, in such case made and provided, barred of all claim to dower of the lands of her said husband; and yet, not being precluded by the laws of Virginia, on account of her separation from her husband, and adultery, from her share of her said husband's personal estate, she is entitled to a widow's share of the distributable surplus of the said John Potter Stegall's personal estate. The court is further of opinion, that upon the proofs in the case, considered in reference to the principles of law applicable to such case, the plaintiffs, Jordan R. Sherwood and Martha Wright ought, and are to be deemed the legitimate children of the said John Potter Stegall, deceased, by his wife, the said Catharine. The court is further of opinion, that the marriage of the said John Potter Stegall, deceased, with Susannah Portwood, after his marriage with the plaintiff, Catharine, and while his wife, the said Catharine, was living, was null and void, and that the said Susannah Portwood was not entitled either to dower of his real or to a distributive share of his personal estate; but that, nevertheless, by the act of assembly of Virginia, in such case made and provided, the defendant, Nancy Smith, daughter of the said Susannah, by the said John Potter Stegall, born after the

---

counsel for the prosecution in the court below, asked her when she last saw her husband? To this question the defendant's counsel objected, and, after a long discussion, the judge overruled the objection, and she answered that she had not seen him for eight years. In his charge to the jury, Yates. J. said, that if, upon a consideration of all the evidence, they should be of opinion that the husband had not had access to his wife, and that the child was really begotten by the defendant, they might find him guilty of both fornication and bastardy; but that they were not to consider any thing that fell from Sarah Myers as evidence of non-access. Per Tilghman, C. J.: "In this the judge was clearly right. In old times it seems to have been holden, that a child born of a married woman, whose husband was within the four seas which bounded the kingdom, could not be considered as illegitimate. This was unreasonable. When the husband has access to his wife, it is right that no evidence, short of absolute impotence of the husband, should bastardize the issue. But when they live at a distance from each other, so that access is very improbable, the legitimacy of the child should be decided upon a consideration of all the circumstances. The law was laid down in Pendrell v. Pendrell, in the fifth year of Geo. II. (2 Strange, 925), and has ever since been considered as settled." On the question of the competency of the wife as a witness, see note of this same case, supra.

said illegal marriage of her said parents, and during the coverture, and the defendant, Elizabeth Jennett, daughter of the said Susannah, born before her said marriage with the said John Potter Stegall, but recognised by him after his marriage with her mother, and during the coverture, as his, the said John Potter's child ought, and are, both to be deemed the legitimate children of the said John Potter Stegall. Consequently, the court declares, that the said Jordan R. Sherwood, Martha Wright, Nancy Smith, and Elizabeth Jennett are the lawful heirs and distributees of the said John Potter Stegall, deceased, entitled each to an equal share of his real and personal estate."