Mr. Justice Clayton
delivered the opinion of the court.
This is the case of a will made by a citizen of Virginia, domi-ciliated in that state at the time of his death, which occurred there, but owning lands and slaves in this state. The will was admitted to probate in Virginia, and subsequently in this state. The appellee, who is the widow of the testator, renounced the provisions of the will made in her favor, and claimed her dower in the realty and her share of the personalty according to law. That renunciation was made and recorded in Virginia, and in this state, as appears from the record. The point presented for determination, is, whether, as to the property in this state, the widow is entitled to participate according to our own laws, or according to the laws of Virginia, the place of domicil of herself and her late husband. It is admitted that by the laws of Virginia, the wife is entitled to only one third of the personalty for her life, whilst by the laws of this state, when as in this instance there are no children, she is entitled to one half in fee *629 simple. To the parties therefore, the decision is of much importance.
It may be as well to remark in the commencement, that as to the real estate, there is no diversity of opinion ; it is universally conceded, that such estate is governed, in its transmission and descent, by the laws of the country in which it is situated. In relation to the distribution of personalty, the law, though formerly the subject of much controversy, appears to be well settled, that the law of the domicil of the decedent is in general to give the rule. It is not universal in its application, nor without some exception, yet as a general rule it has been established with great unanimity. The courts of England and America, the commentators upon their law, and the foreign continental jurists unite in propounding the rule as we have cited it. Story’s Conflict Laws, 403. Toller Ex. 387. 2 Kent Com. 2 Lomax on Exec. 222, and the numerous cases which they quote. The supreme court of the United States, and the highest tribunals of Massachusetts, New York, Pennsylvania, Maryland, Yirginia, Kentucky, Tennessee, Louisiana, North and South Carolina, have all either decided it, or referred to it as án indisputable maxim, which is incorporated into the law as one of its fundamental principles. In scarcely one has it been questioned. A rule, which has met with such general approbation, must have its foundations laid deep in the sense of natural justice of mankind, or address'itself with peculiar force to their feelings of propriety.
Indeed the counsel for the appellee does not contend against the rule, when applied to the distribution of personalty, but they attempt to draw a distinction between a claim for dower, and for a distributive share, and they rely upon the case of Duncan v. Dick, Walker’s Rep. 281, to sustain the distinction, ajad as having settled the principle in this state. They also endeavor to make slaves constitute an exception to the rule.
No authority is cited in support of the attempted distinction between a claim on a share of the personal estate made by the wife, or by a distributee. We have not been able to find any, unless it be the case in Walker, which - will presently be ad *630 verted to. The various statutes of distribution seem to place the rights of the two classes on the same footing, and the elementary writers regard them in the same light, so far as the nature and character of their respective interests are concerned. The extent of the interest is another matter. Toller, 370. 2 Lomax on Exec. 201. We find one case, in a court of high character for learning and ability, in which the law of the domi-cil was applied to the share of a widow in the personal estate of her husband. Smith v. Monroe, 1 Iredell, 346. This too was a case in which slaves formed a part of the estate, and the law of Mississippi, in which state the husbandffiad his residence, governed the disposition.
The case of Stegall v. Stegall, 2 Brock. 256, places the right of the wife to a distributive share of the personalty, on a ground totally distinct from dower, holding that by adultery and elopement, her right to dower is forfeited, but that her right to a distributive share is not thereby affected. We see no reason to draw a line between the widow and the distributee, in this respect, and we cannot lend it our sanction.
Neither do we find any authority which, in states where slaves are deemed and treated as personalty, justifies the attempted distinction as to them. Wheeler’s Law of Slavery, 184. We find various cases in which they have been subjected to the rule, in North and South Carolina, and in Kentucky. 1 Iredell, 346. Latimer v. Elgin, 4 Dy. 26. Sneed v. Ewing, 5 J. J. Marshall, 460, a very elaborate case. We shall not lead the way in the introduction of an exception in this particular.
We come next to the consideration of the case in Walker’s reports. If taken in the broad sense in which it is pressed upon us, by the counsel for the appellee, it stands alone in its exposition of the law upon this subject among the modern authorities, unsustained by any other court. We are fully sensible that the stability of jurisprudence requires an adherence to the decisions of our courts. If solemn judgments, once made, are lightly departed from, it shakes the public confidence in the law, and throws doubt and distrust upon its administration. Yet even this backwardness to interfere with previous adjudications, does *631 not require ns to shut our eyes upon all the improvements in the science of law, or require us to be stationary when all around us is in progression.
When a single case stands unsupported, and rests upon an unsound basis or an erroneous application of principles, it is better, in the language of an eminent judge, “ to abandon it, than attempt to build upon it.” This court has heretofore felt constrained to depart from former decisions of its predecessors. Perhaps no genenal rule can be laid down on the subject. The circumstances of each particular case, the extent of influence upon contracts and interests which the decision may have had, whether it be only doubtful or clearly against principle, whether sustained by some authority, or opposed to all; these are all matters to be judged of, whenever the court is called on to depart from a prior determination. When all this has been done, if no particular mischief is likely to ensue, we believe it to be our duty to decide according to our own convictions of the law.
- With feelings of this kind, and with high respect for the judges who made the decision referred to, we have given it a very careful examination.
Questions upon the conflict of laws, were but a few years ago, comparatively little understood. Cases seldom arose, and whén they did, they were not examined with the benefit of those lights, which the researches and labors of modern jurists have thrown upon them. The first work on this subject in the English language, was written since this case in Walker was decided. Of late years, from the enlarged and easy intercourse among the communities which constitute the great family of civilized nations, they have greatly increased. But nowhere has this increase been greater than in the United States, because of the nature of our confederacy, the enterprising character of our citizens, and the general diffusion of wealth through the community. A fine writer has said, “ that the attention of our courts should now often be drawn to cases of this character, results from the political confederacy of the states, which while it supports among them close and extensive connections in *632 business and policy, yet holds them sufficiently distinct and independent to call into continual exercise that rule which expounds and gives effect to contracts and other transactions, according to the state law, under which they are made to take place, but stops there and carefully distinguishes between construction and right on the one hand, and remedy on the other.” 4 Cowen, 510, n. It is not strange that the frequent discussions of this point, of late, should have rendered the doctrine more familiar than it was at the time that decision was made, or that the court should have mistaken a rule, then but rarely called into exercise, and having but little reference to the ordinary transactions of business.
We have seen with what general assent the rule has been adopted; it may not be out of place to give some examples of the estimate placed upon a refusal to adopt it. Lord Lough-borough said, “ it is a clear proposition, not only of the law of England, but of every country in the world, where law has the semblance of science, that personal property is subject to the law which governs the person of the owner, both with respect to the disposition of it, and its transmission either by succession or by the act of the party.” Sill v. Worswich, 1 H. Blk. 690. The supreme court of North Carolina, in a recent case said, “ no country having a just regard for its own character, or the comity due to other countries, can refuse its authority to collect and apply the goods within her jurisdiction in the proper course of administration.” 1 Iredell, 346. The law of the domicil was declared to give the rule, and in the case of a widow whose husband’s domicil was Mississippi, and whose claim was for her share of her late husband’s slaves. The supreme court of Tennessee, in overruling one of their own decisions upon a kindred subject, lately said, “ but to this decision we cannot assent. The contrary doctrine is supported by a weight of authority altogether overwhelming, and it is based upon grounds of just reason and international convenience, to disregard which, would almost place a state without the pale of civilized communities.” Alsop v. Alsop, 10 Yer. 286. This doctrine commends itself to our sanction so forcibly that we cannot resist it, and we must of *633 necessity, give up the case in Walker, if it is to be understood in the latitude contended for. But in one point of view the case is supported by other authorities, and limited to that extent, and to the actual state of facts then before the court, we have on this occasion no necessity to speak of it. The parties in that case resided in Louisiania, and in that state slaves are regarded as realty, or as immovable property. The counsel for the party who prevailed in that cause, no.w one of our senators in congress, and a most distinguished jurist, rested his argument in a great degree upon the want of reciprocity in the rule between the two states, where one regarded slaves as immovable, and the other as movable property. Under the law of either state, if the law of the domicil gave the rule, the citizens of Louisiana were to be the gainers. Mutual courtesy and international comity lay at the foundation of the rule. This principle is often acted oil in the intercourse of nations, and may be ■no more than just. Story Con. 357. But with this limitation the rule does not avail the appellee in this case, because in the state of her domicil, slaves are deemed, to be personalty.
In the same argument the distinction is drawn between the right of dower^and the right of distribution, but the cases cited arose under the custom of London. That custom adheres to the persons of its freemen, into' whatever part of the kingdom they go, and it furnishes no rule for the construction of the statute of distributions, because it is excepted from the operation of - the English statute. See Pipon v. Pipon, Ambler, 25.
The decision in Walker carries the rule beyond the point of reciprocity. It rests upon a distinction drawn between the claim of the widow op the personalty, and the claim of the distributee. 'We have already stated that we could find no authority for this distinction in the general common or statute law, as contradis-tinguished from the civil law, and the custom of London. The statutes of distribution, ours among the number, treat her claim as a claim to distribution, and it is so treated by the writers on this branch of the law. 2 Lomax on Ex. 201. The only point of difference in the succession to personalty is, that the wife cannot be excluded by the will 'of her husband from all share *634 in it. But tliis is not a question of exclusion, it is only a question as to the law by which the succession is to be regulated.
The court in that case says “ that the statute is not confined to the widows of persons resident in this state at the time of their death,” and that they cannot make an exception. To do so “ would be rather altering the law, and making it conform to principles of national policy and international comity, the proper province of the legislature, than giving a judicial construction to the statute, according to its true intent and meaning.” This view though in the general correct, we think, was carried too far in this instance. The state has no doubt the right to govern and regulate all the property within its limits, without regard to the residence of the owner. It has the right to prohibit and exclude the operation of the lex domicilii, if it chooses to do so. But when no such prohibitory laws exist either express in their terms, or of most manifest intent, the law of the domicil governs both as to transfers inter vivos and testamentary. Story’s Conf. 397. 5 J. J. Marshall, 477. Milne v. Morton, 6 Binney, 361. The reason of this, according to Chief Justice Abbott is, “not that the law of England gives way to the law of the foreign country; but that it is part of the law of England, that personal property should be distributed according to the jus domicilii.” Birtwhistle v. Vardell, 6 Barn. & Cres. 438. 11 Eng. Com. Law Rep. 275. According to another eminent jurist, “the law of England furnishes this principle, and then withdraws altogether, leaving the legal question to the exclusive judgment of the foreign law.” Sir William Scott, in Gordon v. Dalrymple, cited 4 Johns. Ch. 472. But be the reason what it may, the doctrine is firmly established. Were we to refuse to follow it, other states might justly refuse to allow the benefit of it to ns, because of the want of reciprocity. With all our respect for the court which decided the case in Walker, we feel constrained to abandon it, and adopt in this instance a different rule.
It is insisted in the argument that if the rule is applied to slaves, in this country much mischief may result from it. That if a person having his domicil in a non-slaveholding state, and *635 owning slaves here, should die, the slaves would have to be ■emancipated despite our own laws. We do not think this consequence would follow. An exception to the general rule, as firmly settled as the rule itself, is that the international law or law of comity, is not permitted to ■'operate within a state to the prejudice of the government in opposition to its settled policy, or to the interest of its citizens. Story, 30. This consequence could be avoided too, if necessary, by limiting the rule by the principle of reciprocity, and by giving force to it, as to this species of property, only in reference to the slave states. As Virginia is one of that number, the question in this respect, cannot arise in the present case, and we may safely leave it to be determined, when the exigency shall arise. That precise question, however, has been before the courts of Kentucky, in the case of a person who died in Indiana. The court gave effect to the laws of Indiana, saying that the representative might sell the slaves, and distribute the proceeds according to the laws of that'state. Sneed, v. Ewing, 5 Marshall, 482.
There is a case in 5 Peters, 518, of Smith v. Union Bank of Georgetown, which produced some difficulty in our minds. It relates not to the distribution-of an estate, but to its administration in the payment of debts, but the expressions used were so broad and so strong, that they'were calculated to throw doubt over the application of the law of the domicil to the distribution of an intestate’s personalty. Bat upon a careful search we could find no other case in that high tribunal holding similar language, and the cases both going before, and coming after it, adopt the law of the domicil, in reference to distribution. 3 Cranch, 323. Harrison v. Nixon, 9 Peters. The doctrine in the case in 5 Peters, when confined to the facts of the case before the court, creates no embarrassment, and the question may be considered at rest in that court.
Any other rule than this, giving effect to the law of the domi-cil, 'would sometimes work injustice, and prove the source of difficulty in its practical operation. A widow, like a distributee, is only entitled to her share of personalty, after the payment of the debts. In this case, the estate is found in four different *636 states. It would not be easy to,adjust the share in each state, af^er the payment of debts, for in some of the states the debts' might exceed the effects therein. The administration in the state of the domicil is regarded as the principal one, in the others only as ancillary. Before distribution can be rightfully made, all the debts everywhere must be paid. Creditors in each state have a right to be paid, before the funds are withdrawn therefrom, and to be paid according to the priorities and preferences existing by the laws of such state, so far as the assets in that state go. See Hanry v. Richards, 1 Mason, 381. Davis v. Head, 3 Pick. 128. 6 Peters, 518. Now suppose we give effect in favor of the widow, to the laws of this state. Suppose farther, that the debts in Kentucky largely exceed the effects there, and that the unpaid Kentucky creditors sue the executor in "Virginia, and throw the burden upon the estate there, then manifestly the widow is benefited at the expense of the other distributees, who have obtained no preferences here. She would get a share not reduced by the payment of any debts out of this state. Wé might go farther, and suppose the Virginia estate to be exhausted by the payment of the debts, and the injustice would then become more glaring.
We think, therefore, the rule adopting the law of the domicil as the right one to govern distribution, to be more just and equitable. By that rule, after the payment of all the debts, wherever found, the surplus of the whole personalty, wherever existing, is subjected to one uniform law, and all claimants by succession satisfied according to that law. This brings about equality, which in the absence of prior rights is equity. There is one harmonious and consistent rule, instead of rules as numerous as the states, in which the property is found.
All the parties have urged us to give our opinion upon the general principle involved, without regard to any technical objections ; this we have done with confidence, because after a careful examination, we have found the rule to be clearly settled.
The decree of the probate court of Washington county, having been founded on different principles, we hereby reverse the *637 same. And we declare ilie petitioner to be entitled to a share in the personal estate of her deceased husband, according to the laws of Virginia. By the agreement of counsel, filed in the cause, it is admitted that she is entitled by those laws to one third of the slaves for life, and to one half of. the other personalty absolutely, in both instances subject to the payment of debts. The cause is remanded for farther proceedings to be had in pursuance of the terms of this order.
In the order regarding the real estate, there is no error, and the same to that extent is affirmed.
The rule of law in this case having been involved in uncertainty, and this contest having been to some extent for the benefit of all the parties interested, the court directs that the costs incurred in the probate court be paid by the executor, out of the assets, but the costs of this court by the appellee.

Decree reversed.