THE STATE, DEFENDANT IN ERROR, v. HARRY DOUGH-
ERTY AND JOHN MURTLAND. PLAINTIFFS IN ERROR.

Argued November 5, 1913—Decided January 12, 1915.

1. A corrupt combination between members of a legislative body
to enact a law only upon the payment of a bribe is a perversion
of the due administration of the laws under section 37 of the
Crimes act. *Comp. Stat., p.* 1757.

2. In the prosecution for an offence against the public welfare, such
as accepting a bribe, when it appears that there was ground of
suspicion or belief of the existence of official "graft" and a con-
spiracy to obtain bribes, in which the persons caught were not
the passive tools of the entrapping party, but knowingly received
the bribes, the defence of entrapment cannot be successfully
interposed.

3. The declarations of one alleged conspirator cannot be admitted
against his associates unless the conspiracy be established ; but
there is no rule that the conspiracy must be established first, as
the order of proof rests in the discretion of the trial court.

4. Where the common purpose of conspirators embraced not only
the commission of unlawful acts, but also the division of the
proceeds thereof, acts and declarations by any of them, after the
commission of the unlawful acts but before the division of the
proceeds, are admissible in evidence against the other con-
spirators, notwithstanding such acts and declarations referred
to a past act committed in execution of the conspiracy.

5. A charge by the court that the jury should not consider evidence
which had been improperly admitted, if in fact its admission
was improper, was equivalent to striking it out, and the error
in its admission is thereby cured. *Bullock* v. *State,* 65 *N. J. L.*
560, commented upon and distinguished.

6. A witness may use a copy of his memorandum, made at or near
the time of the happening of the events noted by him, to refresh
his recollection.

7. Where there is testimony tending to establish that the defendant
did or said something, which, if believed by the jury, could only
result in his conviction of the offence for which he is on trial,
his failure to offer himself as a witness in his own behalf, either
*to deny or explain such act or acts, is a circumstance proper for*
comment by the court and for the consideration of a jury. *State*
v. *Parker,* 61 *N. J. L.* 308, and *State* v. *Twining,* 73 *Id.* 683,
followed.

On error to the Atlantic Oyer and Terminer.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and KALISCH.

For the state, *Edmund Wilson,* attorney-general.

For the plaintiffs in error, *Bolte & Sooy* and *Robert H. McCarter.*

The opinion of the court was delivered by

KALISCH, J. The plaintiffs in error, who were councilmen of the city of Atlantic City, were convicted in the Court of Oyer and Terminer for Atlantic county, upon an indictment for conspiracy. The indictment contained two counts, but we are only concerned with the first, because the state elected to stand upon it alone. This count charges the plaintiffs in error, in conjunction with others, also councilmen of Atlantic City, with having unlawfully and corruptly combined, conspired and confederated together to pervert the due administration of the laws relating to the municipal government of Atlantic City by corruptly passing and securing the passage of a certain ordinance by the city council of Atlantic City, entitled "An ordinance providing for and authorizing the erecting of a concrete construction to replace the present boardwalk structure heretofore erected along the innerline of the Beach or Ocean Front Park, in Atlantic City," for the passage of which by virtue of their corrupt agreement they, constituting a majority of the members of the city council of Atlantic City, were to receive a bribe of $500 each from one J. K. Harris, a person interested in the passage of the ordinance and received such bribes.

Some of the defendants having pleaded guilty, the case proceeded to trial against the plaintiffs in error and George W. Carmany, Harry J. Mulock and John Donnelly. A verdict of not guilty was directed for Carmany and Mulock; Donnelly was acquitted and the plaintiffs in error were convicted. The validity of their conviction and of the judgment pronounced thereon is challenged by the plaintiffs in error, on

bills of exceptions and also under the one hundred and thirty-sixth section of the Criminal Procedure act.

After the state rested its case, counsel of plaintiffs in error moved for the direction of a verdict of not guilty, which was denied. The defence proceeded with the case and Dougherty became a witness in his own behalf, while Murtland put in no defence. At the close of the entire case counsel of plaintiffs in error renewed his motion for a direction of a verdict of not guilty, which was refused, and it is this refusal which is made the basis of the first four assignments of error.

It is contended by counsel of plaintiffs in error that the motion for a direction of an acquittal should have prevailed because the plaintiffs in error were indicted for a conspiracy to pervert the administration of the laws under the thirty-seventh section of the Crimes act, and that even assuming that they voted corruptly for the ordinance in question, they were not guilty of a conspiracy to obstruct or pervert the administration of the law.

The argument made to support this contention is that the legislature meant in the use of the phrase, "or to commit any act for the perversion or obstruction of justice or the due administration of the laws," some interference with the due and orderly execution or administration of the laws of the state, and by these "laws" is intended statutory laws. So, that, when the defendants voted for the passage of the ordinance, they were legislating rather than administering; and were passing a new municipal ordinance rather than doing anything to pervert or obstruct any of the "laws." And, pursuing this line of reasoning, it is argued that, therefore, a corrupt agreement to vote for such an ordinance is not perverting the administration of any law.

This argument is fallacious in two essential respects—*firstly*, because it rests upon the unwarrantable assumption that the defendants by voting for the passage of the ordinance were legislating and not administering the law, whereas they were in fact doing both; *secondly*, because the proposition assumes that the legislature intended by the term "administration of the laws" statutory laws, exclusively.

If we stop to consider for a moment that the laws under which our state and municipal affairs are governed flow from the organic law of the state—the constitution plus so much of the statute law and common law not repugnant thereto and unaltered or unrepealed at and from the time of the adoption of the constitution—it at once becomes apparent that the argument advanced by counsel of plaintiffs in error is untenable.

By the constitution the power to legislate for the government of cities and other political divisions is conferred upon the legislature, which political bodies in turn derive from the legislature through the enactment of statutes the power to pass ordinances governing and regulating their internal affairs. To administer the organic law of the state the legislature may enact statutes. The enactment of a law was never intended to be a purely ministerial act. Its enactment calls for the exercise of the sound discretion and judgment of the legislator in various respects, such as whether the law is within constitutional authority, whether it is needful to the community, whether it is beneficial or not, &c. In fact, it demands the exercise of a *quasi*-judicial function on the part of the legislator. Hence, when the legislature enacts a law it is administering the organic law of the state as well as legislating in accordance therewith.

Therefore, it cannot reasonably be said that a corrupt combination between members of a legislative body to enact a law only upon the payment of a bribe is not a perversion of the administration of law. And further, it follows as a logical sequence from what has been said that a corrupt combination between members of a legislative body to refuse to enact a law unless a bribe be paid would constitute a conspiracy to obstruct the due administration of the law regardless of the fact whether such enactment was or was not beneficial to the community. But even if it be conceded that that part of the proposition, of counsel of plaintiffs in error, which maintains that by the term "laws" statutory laws is intended is sound, we cannot perceive how in the situation presented it can be of any avail to the plaintiffs in error.

The specific matter charged in the indictment is, in fact, a

conspiracy to pervert the due administration of the statute law of the state. In 1902, the legislature passed an act for the government of such cities as should adopt its provisions. Atlantic City did so, and this statute then became the governing law of that city. Its administration, as a matter of course, is entrusted to the mayor, council and other officers of that city. In so far as it is administered by the council, it is done by the passage of ordinances and the adoption of resolutions, and its due administration requires that each member of the council shall perform his official duties with a single purpose to the welfare of the people of that city, of whom he is the trusted representative. When the council passed an ordinance, not for the purpose of advancing or conserving the interests of Atlantic City in that regard, but corruptly, for the purpose of financially benefiting its members, or some of them, it does not *duly* (*i. e.,* honestly and for the purpose for which the powers vested in that body were conferred) administer the statute of 1902; and a conspiracy to induce that body to pass an ordinance for such ulterior purpose, without regard to the public interests, is a conspiracy to obstruct or pervert the due administration of that statute.

We are not content, however, to accept the narrow construction of the act contended for by counsel of plaintiffs in error. To adopt the view urged upon us would lead to most pernicious consequences in every department of government, by giving to corrupt legislators and those entrusted with administering the law immunity from punishment for their corrupt acts, under this provision of the Crimes act, unless the act done was in violation of some statute law.

In *Moschell* v. *State,* 53 *N. J. L.* (on *p.* 501), Mr. Justice Magie said: "To administer laws is either to superintend their execution or to determine their application. Without laying stress upon the judicial or *quasi*-judicial function of election officers, I think it plain that their acts under those laws are acts of administration in both senses. Whatever perverts or turns from its true end and purpose the administration of those laws is therefore within the provision of this section."

Counsel of plaintiffs in error refer to this case as support-ing their interpretation of the meaning to be given to the statutory phrase "or to commit any act for the perversion or obstruction of justice or the due administration of the laws." But this is obviously not so. Mr. Justice Magie had evidently in mind the facts of the case before him, and they related to a conspiracy to pervert and obstruct the administration of the election laws, by doing certain acts, with intent to unlawfully influence the result of a certain election. And to this situa-tion the language used by the learned justice was pertinent and apt. He was dealing with the election statutes, and it is quite evident from the language used that it neither in terms or purport limits all possible perversion of law and the admin-istration thereof to statute law.

This view is cogently supported by *State* v. *Ellis,* 33 *N. J. L.* 102, which was a case where an attempt was made to bribe a member of the common council of Hudson City, and the court declared the legal rule to be as follows: "Any attempt to influence an officer in his official conduct, whether in the executive, legislative or judicial department of the govern-ment, by the offer of a reward or pecuniary compensation, is indictable at common law."

We agree with the view so aptly expressed by the attorney-general, that the administration of the law referred to in the Crimes act is used in the generic sense; that it must mean of necessity not only statute law, but common law; that the liberty of the individual, property rights and the safety of or-ganized society, are all conserved quite as effectively by the common law as by the statute law, and that the provision of the act must mean that if the law of the land, in either aspect (common or statute), is perverted by a conspiracy, the offence is made out. Blackstone, in treating of the law of England, says it consists of the written and unwritten law. The law of New Jersey consists of the written and unwritten law. When we speak of the law of the state we necessarily include both.

Another ground urged, by counsel of plaintiffs in error, why the motion for a direction of a verdict should have pre-vailed, is stated as follows: "The state having through its

agencies suggested both the crime and the commission of it, it is against public policy that a conviction should be permitted to stand of a crime thus induced."

The statement of fact embraced in this proposition is not accurate. There was testimony in the case from which a jury might have reasonably concluded that the suggestion of the crime and its commission proceeded from the defendants who pleaded guilty to the indictment and the plaintiffs in error through their spokesman and active agent, Phoebus, a fellow-councilman and confederate. Reed, a witness for the state, testified in that regard, as follows: "Mr. Phoebus said to me at that time that he wanted to be perfectly frank with me; that he was satisfied that I was what I represented myself to be; that I had the money and that the plan was good; but he told me there was no use undertaking the proposition without I was in a position to handle money with the members of the city council; that that was the way that the deal could be put through."

Some of the members of the common council of Atlantic City were suspected of being corrupt in the performance of their duties. It was charged that they accepted bribes. The Burns Detective Agency was employed to ascertain the truth of the charges made. It employed Reed (who assumed the name of Harris) to investigate. He, for the purpose of making the investigation, represented himself as J. K. Harris, of the firm of J. K. Harris & Henderson, contractors, with offices at 220 Broadway, and later at 43 Cedar street, in the city of New York. Reed, as a member of the firm of J. K. Harris & Henderson, made the proposition to reconstruct the entire board-walk for a distance of four and a quarter miles and replace it with a concrete structure, reinforced, and that an appropriation of a million and a half dollars would be necessary to carry out this plan. It was to this plan that Phoebus referred in his conversation with Reed above set forth.

An ordinance was framed and introduced in council to carry out the plan, and Phoebus had meetings with the various members of the council as to the amount each was to receive for voting for the ordinance.

It is conceded by the state that the ordinance for which the members of the common council voted was a mere ruse or subterfuge, but claimed that the method adopted was necessary in the interest of the public to discover the corrupt members of that municipal body.

Counsel of plaintiffs in error admit that the government in order to evince the existence of a criminal intent may use decoys or other means to accomplish that end.

But it is urged that in the case under consideration the detective (Reed) was the originator of the crime, and therefore the conviction of the plaintiffs in error was unlawful as against public policy, and that this circumstance differentiates this case from that class of cases where the use of deception and entrapment to expose that which already exists, is held to be lawful.

In this connection it is again necessary to allude to the fact that it was Phoebus, one of the confederates, who suggested that bribes be given to the members of the common·council, and stated to Reed that that would be necessary to secure their votes.

There is much discussion in the books and cases as to what the true rule is governing a defence of entrapment.    In *Grimm* v. *United States*, 156 *U. S.* 604, where a post-office inspector wrote letters under an assumed name to the defendant for obscene matter, and received in return packages of obscene pictures through the mail, the defendant being convicted, it was insisted that the conviction could not be sustained because the letters of the defendant were deposited in the mails at the instance of the government, and through the solicitation of one of its officers; that they were directed and mailed to fictitious persons, &c.    Mr. Justice Brewer (on *p.* 611) said: "It does not appear that it was the purpose of the post-office inspector to induce or solicit the commission of a crime, but it was to ascertain whether the defendant was engaged in an unlawful business.    The mere facts that the letters were written under an assumed name, and that he was a government official—a detective, he may be called—do not themselves constitute a defence to the crime actually com-

mitted. The official, suspecting that the defendant was engaged in a business offensive to good morals, sought information directly from him, and the defendant responding thereto, violated a law of the United States by using the mails to convey such information, and he cannot plead in defence that he would not have violated the law if inquiry had not been made of him by such government official." In *Good* v. *United States.* 159 *Id.* 311, it was said: "The fact that certain prohibited pictures were drawn out of the defendant by a decoy letter written by a government detective was no defence to an indictment for mailing such prohibited publication." *Rosen* v. *United States,* 161 *Id.* 29. To the same effect are *Price* v. *United States.* 165 *Id.* 300; *Scott* v. *United States,* 172 *Id.* 343.

Thus, from the cases in the United States courts, it appears that entrapment is no defence even though the inducement to send objectionable matter through the mail came to a prisoner from a post-office inspector, a species of government detective in the postal department, who wrote him a decoy letter to obtain through the mail obscene pictures, in which the prisoner was suspected of dealing.

In *King* v. *Eggrington et al.,* 2 *Leach Cr. Cas.* 913, the prisoners were indicted for breaking and entering a dwelling-house of Mathew Robinson Boulton and stealing a quantity of silver goods which were laid to be property of Mathew Boulton and John Hodges. It appeared that the prisoners had applied to the watchman of the building to assist them in robbing the house. to which he assented, but immediately afterwards informed Boulton, his employer, "telling him what was intended and the manner and time the prisoners were to come, namely, that they were to go into the counting house, and that he was to open the door into the front yard for them, that Boulton told him, in return. to carry on the business, and that he, Boulton, would bear him harmless; that Boulton also consented to his opening the door leading to the front yard, and to his being with the prisoners the whole time." The prisoners were convicted, and among the questions reserved was, whether the prisoners were guilty of larceny. A majority of

the judges held that the prisoners were guilty of larceny; and this conclusion was put upon the distinct ground that Boulton had not done anything originally to induce it; that his object being to detect the prisoners, he only gave them a greater facility to commit the larceny than they otherwise might have had.

In *Regina* v. *Poynton,* 9 *Cox C. C.* 249, a post-office inspector prepared a test letter for the purpose of testing the honesty of a letter carrier. He enclosed a sum of money in the letter, properly addressed and posted it. The letter was subsequently delivered by the postal authorities to the suspected letter carrier with other mail to deliver. The letter was not delivered, and upon his return to the post-office, as usual, he reported himself to the postmaster as having finished his delivery. In case there were any letters which from any cause he was unable to deliver, it was his duty to bring them back to the post-office. The letter was not returned, nor did the prisoner give any account of it. The letter was shortly after found upon his person, his explanation of its non-delivery being untrue. Held, that he was guilty of larceny.

The principle evolved from the cases appears to be that in a prosecution for an offence against the public welfare, such as accepting a bribe, the defence of entrapment cannot be successfully interposed; and this is so, when it appears that there was ground of suspicion or belief of the existence of official graft and a conspiracy by officials to obtain bribes, in which the persons caught were not the passive tools of the entrapping party, but knowingly received the bribe, especially since the persons entrapping them had no intention to participate in the wrong. *State of Ohio* v. *Diegle,* 21 *Ohio Dec.* 557 ; 11 *Ohio Nisi Prius* (*N. S.*) 593 ; affirmed in 86 *Ohio Rep.* 310.

Counsel of plaintiffs in error condemn in strong terms the means adopted to discover the corruption which existed among the members of the Atlantic City council and denounce the course pursued by the state to obtain the information as against public policy. We think, on the contrary, that public policy demands that corrupt and crooked dealings of public officials should be uncovered and the offenders brought to pun-

ishment, and that it is not the invasion of any absolute right of an individual to subject suspected persons to a test of their integrity. It is no valid excuse for the commission of a crime, by a person holding a public office, that he was tempted. His integrity must be above temptation.

It must be borne in mind that in the case under consideration the suggestion of bribery of the members of the common council in connection with the passage of·the ordinance did not come from Reed, but came from Phoebus, the spokesman of the defendants, who pleaded guilty, and of the plaintiffs in error.

It is further insisted by counsel of plaintiffs in error that the trial judge erred in admitting in evidence the declarations of Phoebus and Lane, two self-confessed co-conspirators, in two respects—*first,* the admission of the declarations in advance of any proof whatever of the alleged conspiracy; *second,* in receiving such declarations made after the consummation of the conspiracy.

The first reason assigned is wholly without substance. The objection goes to the order of proof. This must always rest in the discretion of the court. The record shows that when the objection was made to the admission of the testimony the trial judge provisionally admitted the same upon the understanding that the attorney-general would produce proof connecting the defendants with the transaction, and that unless he did so the testimony would be stricken out. No further objection was made upon that ground, by counsel of plaintiffs in error, and the record shows that no motion was made to have the testimony stricken out, very likely, for the reason that the state had supplied the proof of a conspiracy.

In *Place* v. *Minster,* 65 *N. Y.,* Dwight, Com'r (on *p.* 106), said: "The defendants further insist that the court erred in admitting the declarations of Sherlock, one of the alleged conspirators, as against the other defendants. It is claimed that these were given in at the trial before any conspiracy was established and their admission at this stage of the proceeding was erroneous.

"The claim cannot be sustained. The time of admitting the

declaration is a mere question of order in proceedings which is a matter of discretion with the court. Nothing can be better settled than the main proposition that the declarations of one alleged conspirator cannot be admitted against his associates unless the conspiracy be established.

"There is, however, no rule that the conspiracy must be established first in the order of time. Convenience may require that the declaration be admitted provisionally, subject to subsequent proof of conspiracy. If that is not offered it should be stricken out. If this discretion is abused there will be error."

It does not appear in the present case that this discretion was abused. It may be added in this connection that it is not every error committed by a trial judge in the course of a trial that will lead to a reversal; the error relied on to work a reversal of a judgment must appear to have been harmful and prejudicial to the defendant to accomplish that end.

Now, as to the second ground of objection urged against the admissibility of the declarations of Phoebus and Lane implicating the plaintiffs in error.

It is argued, by counsel of plaintiffs in error, that the conspiracy was consummated on the 22d day of April, 1912, when the ordinance was adopted on its final passage, and that the error complained of was in receiving the testimony of Reed as to what was told him by Phoebus on the 23d, 28th and 29th of April. It does not appear from the record that Reed testified to any declaration made by Lane respecting any of his alleged co-conspirators after the passage of the ordinance.

Reed testified that on the 23d of April he met Phoebus, who told him, Reed, that there were three members of council who would not accept money from Mr. Smiley, but they would take it from him, Phoebus. The witness was proceeding to mention the names when an objection was interposed by defendants' counsel and the objection was overruled and an exception was allowed.

The witness then mentioned the names of Murtland, Carmany and Mulock. The witness further testified that Phoe-

bus told him that it placed him, Phoebus, in an embarrassing position, because the members of the council expected their money after the ordinance passed, and that he had told them that he had the money on his person and he felt obligated to pay each of them as he had agreed. Reed further testified that he told Phoebus he would see what could be done and that he, Reed, was perfectly willing to advance the balance of the money. The material part of this conversation is that Phoebus told Reed that Murtland would take money from him, Phoebus, and from no one else. On the 28th of April Reed met Phoebus in the former's apartment in the Waldorf-Astoria, and Reed says that he there gave Phoebus $1,500 to distribute among the members who had not received their money, among whom he named Murtland. Reed also testified that then and there at his request Phoebus made out a list of all those who had not voted for the ordinance, and also wrote out the names of those who had not received their money, among which was the name of Murtland. On the 29th of April, Phoebus again called at the Waldorf-Astoria upon Reed and reported that out of the five names which were on the list as unpaid, and among which was Murtland, he paid Mulock and Carmany. The list given by Phoebus on the 28th of April indicated that Dougherty had already received his money and that Murtland was unpaid.

It is an undisputed fact that the ordinance was finally passed on its third reading April 22d, 1914. The ordinance was introduced in council February 12th, 1914. It passed the council on a second reading March 11th, 1914. From the record it appears that after its second reading, and before its final passage, on the 4th day of April, Reed, who was passing as Harris, went by arrangement to Malia's saloon, in Atlantic City. Malia was a member of the council, who was in the alleged conspiracy and who pleaded guilty to the indictment. There it was arranged, through Malia, that the councilmen who had not been paid should meet one Smiley, who was represented by Reed as the man who had the finances to back the enterprise, at Young's hotel, in Atlantic City, on the following day, to receive their money according to

agreement. Malia suggested that cards be prepared by which each councilman might identify himself to Smiley who would be prepared to make the payments. Accordingly, cards were made out and left with Malia, who undertook to distribute them among the councilmen, including Dougherty and Murtland, the plaintiffs in error, and to instruct them how they might identify themselves at Young's hotel. Malia, in the presence of Reed, called up on the telephone the various members of the common council with a view of perfecting this arrangement. As has been said, the day agreed upon for payment was the day following, April 5th, 1912. On that day Malia was at Young's hotel completing this arrangement with the various members of the council. Reed was there also. Reed says that he saw Murtland, the plaintiff in error, come in and go in the back room of the saloon, and when he, Murtland, came out he saw in Murtland's hand one of the cards that had been previously prepared for identification. It was on this occasion that the conversation took place between Reed and Murtland, which will bear upon the question whether all the details of the alleged conspiracy had been consummated at the time when Reed was permitted to testify as to statements made by Phoebus to him on the 23d, 28th and 29th of April, 1912, several days after the passage of the ordinance. The conversation on this occasion between Reed and Murtland was in substance, as follows: Murtland asked Reed how much money he (Murtland) was to receive that day; Reed told him $500. Murtland said "that was not sufficient; that he would not be satisfied to accept that amount of money; that he felt as though he had not been treated right in this matter; as he was the legitimate leader of council that he did not care to take the risk with anything less than $5,000; * * * that he could not understand why it would not be just as well for me (Reed) to pay him $5,000 now as after the contract was awarded; that he was in a position to kill the ordinance." To this Reed answered that he "wanted to treat him right, but could not consider treating him any differently." Murtland then asked "to handle the money." Reed would not accede to this request.

Murtland then said that he would not "interfere in anyway with the program; that he considered all along that I (Reed) should remember him when it came to the contract." Reed replied that "he would be very glad to do so." The interview terminated with Murtland's announcement "that he would not interfere; that he would come right along with us just the same."

Counsel of the state claims that the understanding thus reached clearly contemplated that Murtland should be paid either in money or upon some basis of profit when the contract was awarded. Hence, it is argued that the declarations of Phoebus were admissible against the plaintiffs in error after the passage of the ordinance, because the unlawful undertaking was not complete (so far as the legality of proof is concerned) until every detail which related to the original agreement had been carried out. The reasoning advanced to support this view is that the conspiracy gave rise to reciprocal undertakings; that it of necessity involved the corrupt passing of the ordinance and the incidental payment of money after such passage; that whatever fact or circumstance which related to the original agreement whether occurring before or after the passage of the ordinance, but before all the details of such original agreement had been fully consummated, was a part of the *res gestæ.* We deem this position sound and there are numerous well-considered cases to support it. But first of all, it is proper to note in this connection that the attack made upon the validity of these alleged *post* conspiracy declarations of Phoebus, by the counsel of plaintiffs in error, is founded upon the failure to distinguish between the accomplishing of an overt act in pursuance of the common object of the conspiracy and the consummation of the object of the conspiracy. While it is true that the statute makes it necessary that an overt act be done in pursuance of the unlawful agreement in order to make it an indictable offence, and while the proof of such an overt act is sufficient to warrant a conviction, it by no means follows that the common object of the unlawful agreement has thereby been consummated. Oftentimes there are many steps neces-

sary to be taken by the conspirators to achieve the common object of the conspiracy; and each step taken may in itself be an overt act sufficient to make the unlawful agreement indictable and to convict the conspirators, notwithstanding that the common object of the conspiracy was not wholly attained.

The case under consideration furnishes an apt illustration of this. The common object of the conspiracy was in fact a conspiracy to pervert the due administration of law, by means of bribery.

The passing of the ordinance was a means to that end. It was a step—an overt act to accomplish the common object contemplated by the conspirators to pervert the administration of the law, by receiving bribes for their official actions, not only in the present payment of money, but also in such pecuniary advantages that may be derived from the contract to be given out under the ordinance for the performance of the work. Thus, Murtland, one of the plaintiffs in error, was to be paid either in money or upon some basis of profit when the contract was awarded.

The principle on which the acts and declarations of one conspirator are admitted in evidence against the other conspirators is well stated in *Roberts et al.* v. *Kendall, 2 Ind. App.* 339; *29 N. E. Rep.* 488, by Mr. Justice New, as follows: "That by the act of conspiring or confederating together the conspirators have jointly assumed to themselves as a body the attribute of individuality so far as constitutes the prosecution of the common design, thus rendering whatever is said or done by anyone in furtherance of that design a part of the *res gestæ* and therefore the act of all. It is settled that when a conspiracy is once established, and until the consummation of the object in view, if the conspiracy last that long, every act and declaration of one conspirator in pursuance of the original concerted plan, and in reference to and in furtherance of the common object, even in the absence of others, is in contemplation of law the act and declaration of all, and is therefore original evidence against each."

In *Encycl. Ev.* 432, under the caption of *"Division of*

*Fruits of Crime,*" the text reads: "'Thus where the common purpose of the conspirators embraced not merely the commission of a series of unlawful acts, but also the disposition of the fruits of those acts and the division of the proceeds amongst themselves, acts and declarations by any of them, though after the commission of the unlawful acts, but before the disposition or division, are admissible in evidence against the other conspirators, notwithstanding such acts and declarations also referred to a past act committed in execution of the conspiracy." The text is supported by the following well-considered cases: *Com. v. Scott,* 123 *Mass.* 222; *Pacific Live Stock Co. v. Gentry,* 61 *Pac. Rep.* 422; affirmed on rehearing in 65 *Id.* 597; *State v. Pratt,* 121 *Mo.* 655; *People v. Opie,* 123 *Cal.* 294; 55 *Pac. Rep.* 989; *Baker v. State,* 80 *Wis.* 416; *State v. Grady,* 34 *Conn.* 118; *Kelly v. People,* 55 *N. Y.* 565; 50 *N. W. Rep.* 518; *Com. v. Brown,* 14 *Gray* 419.

In *People v. Trim,* 39 *Cal.* 75, it was held that where the conspiracy charged is to burn property insured against fire with intent to injure or defraud the insured, the object and purpose of the conspiracy are not fully accomplished until payment from the insurer has been actually procured, and hence acts or declarations of one of the conspirators evidencing an effort on his part to procure such payment are competent as acts and declarations of co-conspirators in furtherance of the original objects and purposes of the conspiracy.

In *People v. Opie, supra,* the court (on *p.* 990) said: "In certain cases where the conspiracy discloses an intention to divide the property to be stolen, evidence of the acts and declarations of a co-conspirator taking place at any time prior to the division are admitted. This is upon the theory that the conspiracy does not end until that time."

Testing the facts of the case *sub judice* by the rule of law to be extracted from the cases above quoted, what is the situation disclosed? Concretely stated, it is this: That Phoebus was the active agent of the conspirators; that the common object of the conspiracy was to obtain a bribe or other unlawful profit in some way or another, for each member of

the conspiracy, by his corrupt official act. The passage. of the ordinance was a means to that end, but was in nowise a consummation of the unlawful design of the conspiracy. The conspiracy comprised much more than the passage of the ordinance: It included the payment of a bribe to each member of the conspiracy. It also contemplated a contract to be given out under the ordinance for the work to be done, from which contract Murtland, one of the plaintiffs in error, was to derive a personal benefit.

It must be borne in mind that each conspirator was to receive a bribe. The bribe Murtland was to receive was somewhat different in character from what the others agreed to take or had taken. Murtland was to receive his bribe when the contract was given out. It cannot be well said that before Murtland had been paid, that the full common object of the conspiracy had been consummated. It is no valid answer that the contract may never be given out and thus the common object of the conspiracy can never be consummated, and hence there will be no limit in time when the declarations or acts of a co-conspirator will cease to be efficacious to bind one who has not received the fruits of the crime. If this were so, it is difficult to see how any declarations of co-conspirators would be evidential in any case where the conspiracy failed.

We think therefore that the acts and declarations of Phoebus, made by him after the passage of the ordinance, were competent as against his co-conspirators.

And what has been said in that regard applies equally as well to the testimony given by Detective Burns, as to declarations made by Kessler, Lane and Phoebus, three of the self-confessed conspirators, at the Marlborough-Blenheim hotel, at Atlantic City, on May 31st, about six weeks after the passage of the ordinance, in the absence of Murtland. Dougherty appears to have been present at a part of the interview. Consequently the trial judge erred in favor of the defendants when he instructed the jury to disregard the testimony of Burns as to what occurred at that interview. That part of the charge was evidently prompted by a mistaken notion

that the common object of the conspiracy had been consummated by the passage of the ordinance, whereas the testimony was clearly admissible.

But even though the testimony was incompetent we cannot perceive any harm or prejudice resulting therefrom to the plaintiffs in error, in view of the emphatic warning by the trial judge to the jury to disregard it.

The plaintiffs in error rely on *Bullock* v. *State* (*Court of Errors and Appeals*), 65 *N. J. L.* 560, as authority for the proposition that nothing that a trial judge may say in his charge to a jury in directing them to exclude from their consideration illegal testimony admitted during the trial against objection, can cure such an error, after counsel have summed up.

A reference to Bullock *v.* State will show that it does not go to any such length. On pages 575 and 576, Mr. Justice Depue said: "Where evidence which is illegal is received by the court in the progress of the trial, it is competent for the court subsequently to exclude such illegal testimony. In such a case no error could be assigned upon the reception of the testimony. But the admission of the evidence being error, it must clearly appear that the testimony illegally admitted was so eradicated from the case that its admission could not have injuriously affected the accused." What the court there decided was that it did not appear that such illegal testimony was so eradicated. For Justice Depue further said: "The manner in which the evidence of Campbell was put in and the character of his testimony were calculated to impress upon the minds of the jurors a conviction of the natural propensity of the prisoner to resort to extreme violence on slight provocation. To have removed the effect of this evidence it would, at least, have been necessary to have expunged it from the record formally and emphatically before the testimony was closed and the summing up of counsel was commenced. No order overruling the testimony was made, and it may be assumed that it was commented upon by counsel in their arguments before the jury."

It is therefore argued, by counsel of plaintiffs in error,

that in order to have cured the error in admitting the illegal testimony, the trial judge should have expunged such testimony " before the testimony closed," &c.

It is obvious that what was said by Justice Depue in this respect was *arguendo,* and to emphasize the view that such illegal testimony should be emphatically withdrawn from the consideration of the jury, and without intending to fix any given time when it should be done; and that this is so, is especially made clear by what the learned jurist further said, in this connection, on page 576, in commenting upon the court's charge. He said: "In the course of the delivery of the charge, the judge, adverting to this testimony, used this language: 'I will digress to say a word about some testimony introduced in the case, tending to show violence on his (the prisoner's) part on other occasions. I had some hesitation in admitting the testimony of the witness Campbell, but I judged it to be legal, because of the prisoner's own statement that he had never had any trouble before this. On reflection, after considering the evidence of Campbell, I think it is my duty to tell you to disregard that, because it seems to me too uncertain on the question of identity to be of value. It would not be evidential simply to overcome proof of reputation.' It will be observed from this language that in the charge the judge did not instruct the jury to disregard the evidence because it was illegal, but because it was too uncertain on the question of identity to be of value. It is quite possible that in the minds of the jurors the question of identity may have been established. We think that notwithstanding the charge of the judge on this subject, the evidence of Campbell may have had, and probably did have, an influence on the minds of the jury in rendering its verdict."

It is thus plain to be seen that the learned justice did not predicate the result reached in the Bullock case upon the ground that the action of the trial judge was too late but manifestly upon the ground that the language of the trial judge was not an emphatic and unequivocal withdrawing of the admitted illegal testimony from the consideration of the

jury. In that vital respect the case *sub judice* is to be distinguished from the Bullock case.

In the case before us the trial judge used these words: "I charge you that you must dismiss that whole matter from your minds. It is not evidential in this case. It should have no bearing whatever in your determining upon the guilt or innocence of these defendants. Whatever took place at the Marlborough-Blenheim, I mean in regard to anything that was said as to who was connected with this combination or this agreement, is to be disregarded by you and to have no influence upon your minds. I mean that episode alone. Whatever conduct there was on the part of Dougherty you may consider when you come to consider the evidence in his case, so far as it relates to him but I mean so far as it relates to establishing a combination, or inferring any guilt whatever from what was said upon that occasion, at the Marlborough-Blenheim, by Detective Burns, that I charge you to disregard wholly, because it took place after the commission of the crime, and it is to be disregarded. I trust that every gentleman on the jury will follow what I say to him in that respect."

In *Pennsylvania Railroad Co.* v. *Roy,* 102 *U. S.* 200, Mr. Justice Harlan, in delivering the opinion of the court, said: "Notwithstanding this emphatic direction, that the jury should exclude from consideration any evidence in relation to the pecuniary condition of the plaintiff, the contention of the defendant is, that the original error was not thereby cured and that we should assume that the jury, disregarding the court's peremptory instructions, made the poverty of the plaintiff an element in the assessment of damages; and this, although the record disclosed nothing justifying the conclusion that the jury disobeyed the direction of the court. To this position we cannot assent, although we are referred to some adjudged cases, which seem to announce the broad proposition that an error in the admission of evidence cannot afterwards be corrected by instructions to the jury so as to cancel the exception taken to its admission. But such a rule would be exceedingly inconvenient in practice, and would often seriously obstruct the course of business in the courts. It cannot be sustained

upon principle or by sound reason, and is against the great weight of authority. The charge from the court, that the jury should not consider evidence which had been improperly admitted, was equivalent to striking it out of the case. The exception to its admission fell when the error was subsequently corrected by instructions too clear and positive to be misunderstood by the jury."

A note to *Holmes* v. *Moffat,* 120 *N. Y.* 166, reads: "Where the court instructs the jury to disregard testimony improperly received, and there is other evidence to support the verdict, it will be assumed that the instructions were obeyed, and the error in the admissions of the evidence will be cured." On this point, the court in *Pennsylvania Railroad Co.* v. *Roy,* 120 *U. S.* 451, say: "Any other rule would make it necessary, in every trial, where an error in the admission of proof is committed of which error the court becomes aware before the final submission of the case to the jury, to suspend the trial, discharge the jury, and commence anew. A rule of practice leading to such results cannot meet with approval." Other cases on the subject are *Whitney* v. *Bayley,* 4 *Allen* 173; *Com.* v. *Shepperd,* 6 *Binn.* 283; *Butler* v. *Detroit,* 131 *Mich.* 618. In this state, the case of *Bernadsky* v. *Erie Railroad Co.* (*Court of Errors and Appeals*), 76 *N. J. L.* 580, is to the same effect.

It is further urged that the trial judge erred in permitting the witness Stem to refer to and read from a copy of his stenographic notes to refresh his recollection of what he had heard over the dictagraph.

It appears that Stem took down stenographic notes of a conversation he heard by means of a dictagraph. He transcribed these notes on his typewriter. He handed the original notes with the copies to the Burns Detective Agency. At the trial he produced a copy of the original notes made by him upon his typewriter. He testified that he searched for his original stenographic notes but could not find them and that the copy that he had was a true transcription made by him of his stenographic notes. Thereupon the court ruled that

the witness might use the copy to refresh his recollection of what he heard over the dictagraph.

Greenleaf, in volume one of his work on *Evidence* (*Lewis' ed.* 1896) 436, says: "It does not seem necessary that the writing should have been made by the witness himself, nor that it should have been an original writing, provided, after inspecting it, he can speak to the facts from his own recollection. So, also, where the witness recollects that he saw the paper while the facts were fresh in his memory, and remembers that he then knew that the particulars therein mentioned were correctly stated."

In a note to the text the author says: "But a witness has been allowed to refresh his memory from the notes of his testimony, taken by counsel at a former trial. *Laws* v. *Reed,* 2 *Lew. Cr. Cas.* 152. And from his deposition. *Smith* v. *Morgan,* 2 *M. & Rob.* 259. And from a printed copy of his report. *Home* v. *Mackenzie,* 6 *C. & Fin.* 628; *Murray* v. *Cunningham,* 10 *Neb.* 169; *Callaway* v. *Varner,* 77 *Ala.* 543; *Huff* v. *Bennett,* 2 *Seld. (N. Y.)* 339.

In *Com.* v. *Ford,* 130 *Mass.* 64, it was held that a witness may be allowed to refresh his recollection of what was said at a particular time, to look at a printed copy of his own written report, although the absence of the written report is not accounted for. The case contains a valuable collection of English cases upon the subject.

Prof. Wigmore, in volume one on *Evidence,* in a note on page 343, refers to this case and *Coffin* v. *Vincent,* 12 *Cush.* 98, as stating the correct doctrine.

In *Myers* v. *Weger,* 62 *N. J. L.,* Judge Adams, in delivering the opinion of the Court of Errors and Appeals (on *p.* 441), said: "It is said that a memorandum is for mere reference, and can be used only to excite the recollection. This is too narrow a statement of the rule. So strict a limitation would make memoranda unavailable in many cases where they are of value. The use by a witness of his own memorandum, made at or near the time of the events recorded, is not merely to refresh the memory by reviving faint impressions, but also to supplement the memory by preserving details that would

*otherwise* be forgotten. In a case of the latter class the witness is able to prove the details, not by remembering the particulars that compose them, but because the circumstances under which the memorandum was made afford satisfactory assurance that at the time of the entry its contents were known by the witness to be true. It follows that a witness, in using his own memorandum, may not merely refer to it, but also may testify from it. It may be added that the use of a memorandum rests very much in judicial discretion."

Another ground urged by plaintiffs in error for reversal is the refusal of the trial judge to direct a verdict of acquittal in their favor. Counsel of plaintiffs in error, in their brief on this point, say: "The evidence discloses an undoubted combination or conspiracy between Phoebus, Malia, Lane, Kessler and Palmer, and the detective, Reed. They were frequently together and undoubtedly conspired together. There is no evidence directly or indirectly connecting either Murtland or Dougherty with the plan."

This is an inaccurate statement of the evidence. There was proof tending to establish that both Dougherty and Murtland met with the other conspirators at Malia's saloon, before the passage of the ordinance. Reed testified to that. It further appeared that both Dougherty and Murtland voted for the ordinance. Reed testified that cards had been prepared for both Dougherty and Murtland, at Malia's saloon, for the purpose of identifying themselves to Smiley, who was to be the paymaster and that Murtland had his card of identification in his hand, at Young's hotel. There was also evidence that Dougherty received $500 for his vote.

Reed's testimony as to the conversation with Murtland at Young's hotel already detailed is evidence on this point and need not here be repeated.

Under this state of the evidence we conclude that the trial judge properly refused to direct a verdict of acquittal as to Dougherty and Murtland.

Lastly, the plaintiffs in error seek a reversal of the judgment because the trial judge charged the jury, as to the

failure of Murtland to take the witness stand in his own behalf, as follows: "He did not take the stand, and you have a right to consider the fact that he did not go upon the witness stand and testify. There was testimony, if I remember rightly, in this case, which was material and which Mr. Murtland could have denied if it were not true. He did not see fit to take the witness stand to deny it. Why not? That is a question for you to decide. You will make that inquiry. You ask yourselves why was it that Murtland, who was here in court and heard the testimony against him, sat mute and did not avail himself of the privilege the law affords him to go upon the witness stand and defend himself against the charge made." We perceive no error in this.

It is to be borne in mind that Reed had testified to a conversation had with Murtland at Young's hotel in which it appeared that Murtland demanded $5,000 for himself, as the price for his co-operation in the scheme of his fellow conspirators, to be paid him then or when the contract was awarded, and that he also asked him, Reed, to handle the bribe money which was to be distributed among the councilmen who were in the combination, and finally that he, Murtland, asked to be remembered when the contract was awarded which he, Reed, promised to do, whereupon Murtland replied that he would come right along, &c. If the jury believed this testimony then it could only result in the conviction of Murtland of the offence with which he was charged. Therefore, in this state of the evidence, under *State* v. *Parker,* 61 *N. J. L.* 308, and *State* v. *Twining,* 73 *Id.* 683, the comment of the court was not improper.

Judgment will be affirmed.