CASE 43—ACTION TO CANCEL A DEED AND TO QUIET TITLE—MARCH 19.

# McQuinn v. McQuinn.

### APPEAL FROM BREATHITT CIRCUIT COURT.

JUDGMENT ALLOTTING HOMESTEAD TO DEFENDANT AND PLAINTIFF APPEALS. REVERSED.

DOWER—FORFEITURE BY LIVING IN ADULTERY.

Held:   Under Kentucky Statutes, sec. 2133, providing, that if the wife voluntarily "leave her husband" and live in adultery, she shall forfeit all interest in his estate, unless they afterwards become reconciled, and live together as husband and wife; the wife by living in adultery in the husband's home during his enforced absence, forfeits her right to have either homestead or dower.

J  J. C. BACH AND S. H. PATRICK, ATTORNEYS FOR APPELLANT.

1  Adultery of wife forfeits interest in estate of husband, Ky Stats., 2133; Goss v. Froman, 89 Ky., 318; Davis, &c. v. Calvert, 18 Ky. Law Rep., 975.
2. An answer to a petition seeking to set aside a deed, made after the grantor had been adjudged a lunatic, that does not assail the inquisition, nor allege a restoration to reason, nor that the deed was made during a lucid interval, does not state a defense. Carpenter v. Carpenter, 8 Bush., 286; Jenkins v. Jenkins, 2 Dana, 103.
3. A deed that describes the premises attempted to be conveyed as "All the land I own in Breathitt County" is too indefinite to pass title. Tiedeman on Real Property, 827; Washburn on Real Property, 881; Withers v. Payne, 12 B. M., 345; Caskey v. Williams, 10 Ky. Law Rep., 877; Gooch v. Benge, 90 Ky., 893.

4. Upon the cancellation of a deed the grantee can have judgment for nothing more than the consideration expressed therein, and especially in the absence of an allegation in the answer to the effect that the consideration paid was different from that expressed.

5. When a deed shall be made to one person and the consideration be paid by another, no use or trust shall result in favor of the latter. Kentucky Statutes, 3353.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Jerre McQuinn died in 1897, while confined in the Eastern Kentucky Lunatic Asylum, leaving no issue, and intestate. His father (appellant) is his sole heir at law, and appellee, Catherine McQuinn is his widow. On January 25, 1889, he was found by an inquest in the Breathitt county court to be a lunatic, and was ordered sent to the asylum for the insane, but it appears he was not actually incarcerated till 1891. On September 9, 1889, he executed to appellee a deed purporting to convey to her all his property, real and personal, including choses in action. The descriptive part of the deed relating to the real estate says merely, "All the land I now own in Breathitt county." The recited consideration was $100 paid and love and affection. This suit was brought March 3, 1898 by appellant, as heir at law of Jerre McQuinn, to have the foregoing deed canceled, and his title to the land quieted; he alleging that the deed was executed while the decedent was of such unsound mind as to be incapable of contracting, or knowing his property, or the nature of the instrument he was executing; that the $100 consideration was not paid; and that the execution of the deed was procured by the fraud and undue influence of appellee over the mind and conduct of the decedent. The petition further charged, in anticipation of appellee's claim for dower or homestead in the land if the deed should be canceled, that she had abandon-

ed him, and lived in adultery with one "bad Tom Smith," and was so living at the time of her husband's death.

Appellee's answer attempted to deny the allegation of the unsound condition of her husband's mind at the time of the making the deed, but it did not traverse the finding of the inquest, nor plead that the deed was executed at a lucid interval. Nor does her answer sufficiently deny the adultery charged, but it is clearly proven, whether properly traversed or not. In addition, she pleaded that the land in controversy was worth less than $1,000 at the time of her husband's death, at which time she alleges she was occupying it as a homestead. The reply charged that neither the husband nor the wife was occupying the place as a homestead at the time of his death, because he was then, and for some five or six years previous had been, confined in the asylum at Lexington, an incurable, confirmed lunatic, and she was at the time of his death confined in the Kentucky State penitentiary under a life sentence for the murder of Dr. Rader in 1895. For this same murder her paramour, Smith, was hung. She further pleaded that her money and property had in part paid for the land in controversy, and that the conveyance by her husband in 1889 was in consideration of this fact. She alleged that she had paid fully $500 towards the consideration.

The proof establishes the following state of facts to our entire satisfaction: The land was not paid for in any part by property or means of the wife. The husband, Jerre McQuinn, was not of sound mind on the 9th of September, 1889, when the deed was made to appellee; and, furthermore, its execution was procured by her fraud and undue influence upon him. She had lived in open adultery with Tom Smith for some months immediately before their arrest for the murder of Dr. Rader, and so lived at the

.McQuinn v. McQuinn.

home place of McQuinn, the husband, he being then confined in the asylum for the insane at Lexington, Ky. The husband having continued at the asylum a lunatic inmate until his death, she having been since her arrest, until his death, in confinement in jail or the penitentiary, there was no reconciliation between them, or condonement. The Circuit Court (held by a special judge) decided that the husband was mentally unsound when the deed was executed, and in his opinion incorporated in the judgment announced that he was unable to determine what part, if any, of the consideration was paid upon the land by the wife (though it is no where suggested that there was ever an agreement between McQuinn and wife, or with anyone for her, that he would so invest the money for her), but based his judgment upon the idea that, inasmuch as the wife had not "eloped," or left her husband, and lived in adultery, she was not barred, and he canceled the deed, and adjudged her the whole of the land for her life, as a homestead in lieu of dower. We concur in the finding of the facts—at least in the conclusions thereon apparently reached by the trial judge; but can not willingly concede the legal proposition announced as to the effect of the adultery. We may say that the learned trial judge is not without authority for his position, but we incline to the opinion that authority equally as weighty, and supported by a juster spirit and clearer reasoning, point us to the opposite conclusion. The Kentucky statute on this subject is as follows: "Sec. 2133. If the wife voluntarily leave her husband and live in adultery, or if the husband voluntarily leave his wife and live in adultery, the party so offending shall forfeit all right and interest in and to the property and estate of the other, unless they afterwards become recon-

ciled and live together as husband and wife." It gives
us pleasure to find a comparative dearth of authority in
this State, and but little in this Union, upon the ques-
tion involved, as such absence speaks for the rare occur-
rence of cases involving a construction of this and simi-
lar statutes. The statute in question is fashioned after,
and is a very close imitation of the statute 13 Edw. I. c.,
34, commonly called the "Statute of Westminster II," en-
acting that, if a wife elope from her husband, and continue
with an adulterer, she shall be barred of her dower, un-
less her husband willingly, and without coercion of the
church, reconcile her, and suffer her to dwell with him.
At that period it was the fiction of the law that a married
woman had no will of her own while in the presence or
under the dominion of her husband, and that so long as
she was thrown upon his estate or within his manor she
was presumably under his dominion, and therefore could
not yield consent to an unlawful use of her person. It is
not so strange, therefore, that some cases may be found
construing the original statute which held that there
must be an actual elopement, or leaving of the husband's
home and estate, coupled with subsequent adultery, to bar
the adulteress of dower. It would have been, indeed, a
surprising, as well as unfortunate, evidence of the law's
impotency, had not a more liberal and more rational view
and construction of the statute been evolved. At first we
find, if the wife be detained against her will, but subse-
quently, while away from her husband, live in adultery,
she was barred. Co. Litt. 32b. Then it was held that
there need not be a continuing absenting of herself from
the husband's premises. Said Lord Coke: "Albeit she
doth not continue to remain in avowtry with the adulter-
er, yet, if she be with him, and commit adultery, it is tar-

rying within this statute." Id.  And later Chief Justice
Tindal, in Hetherington v. Graham, 6 Bing., 135, said: "It
is contended on the part of the demandant that each part
of the description of the offense contained in the act must
be taken to be cumulative; so that the dower is not barred
unless the wife has left her husband willingly with the
adulterer; has gone away with him, and has also contin-
ued with him.  Whilst on the part of the tenant it is in-
sisted that it is sufficient to bring the case within the stat-
ute if she has of her own consent left the society of her
husband, and, after she has so left him, committed the
act of adultery.  And the court is of the latter opinion.
It may be admitted, as the fact is, that in all the ancient
precedents the leaving of the husband by the wife is stated
to have been 'with the adulterer.'  But we think this is
not conclusive on this point; for, as there can be no doubt
that the case is within the statute where all the circum-
stances concur, so the pleader would, of course, insert them
where the facts of the particular case warranted the in-
sertion.  And, on the contrary, there is direct authority
that all the circumstances mentioned in the statute need
not concur in form, provided they do so in substance." 2
Co. Inst., 435.  Further departing from the original con-
struction given the act as seemed to be required by a strict
adherence to its phraseology, Lord Coke said (2 Inst., 436)
that, if the wife leave her husband's house of habitation,
it is an elopement, within the statute.  "Though she re-
main with the adulterer in any of the lands or manors of
her husband," he observes, "yet she shall be barred of her
dower by this breach, without the husband's free recon-
ciliation, albeit it hath been otherwise holden; and the
reason that they yielded is because it is no elopement,
whereas it appeareth before that that the words of *reliq-*

*uerit'* and *'abierit'* are not of the substance of the bar of dower, but the adultery and the remaining with the adulterer as is above said: and albeit she and the adulterer remain within any of the land or manors of the husband, yet (the words being *'si uxor reliqueril'* and *'abierit'*) she hath left and gone from her husband in that case, which is a personal offense." The Virginia statute contained in the Revision of 1819 is in these words: "If a wife willingly leave her husband and go away and continue with her adulterer, she shall be barred forever of action to demand her dower that she ought to have of her husband's land, if she be convicted thereupon except," etc. 1 Rev. Code 1819, p. 404. In Stegall v. Stegall, 2 Brock., 256, Fed. Cas., No. 13,351, which arose under this statute, the wife refused to accompany her husband to his abode, claiming in error that he was already married to another, and a separation ensued. She then contracted a second marriage, living and cohabiting with the second husband. In denying her dower in the estate of her first husband, Chief Justice Marshall said: "So far as respects that part of the provision which relates to the wife's willingly leave her husband, I think it is satisfied by any separation which is voluntary on her part; and I think any separation voluntary which is not brought about by his act, or by any restraint upon her person." "The words, 'and go away and continue with her adulterer,'" the Chief Justice continued, "would, I am much inclined to think, be satisfied by an open state of adultery, whether the woman resided in the same house with the adulterer or in separate houses; whether in her own or a friend's house or his." The reason of the statute must have been to insure the fidelity of the spouse to the marital vows, and to prevent their open breach in that manner that would not only

McQuinn v. McQuinn.

violate their obligation, but bring shame, upon the name and family. The tendency of treatment of this question, both by statutory and judicial action, is seen to have been to meet this spirit of the statute's enactment. "Abandonment," as used in our statute relative to divorce, has been construed by this court to mean the refusal by the spouse to recognize and contribute to the marital relation for a period of one year, although the parties slept beneath the same roof. Evans v. Evans, 93 Ky., 516, 20 S. W., 605). So, a wife may "voluntarily leave her husband, and live in adultery," by voluntarily adopting the adulterous relation in the husband's enforced protracted absence from his home, though she continue to reside thereat. It should detract nothing from her offense, and add nothing to her rights, that she has boldly received the libertine into her husband's home in his absence, and befouled his couch, while dishonoring his name and shaming their holy relation. The judgment is reversed, and cause remanded, with directions to enter judgment for appellant, setting aside and canceling the deed to appellee of date September 9, 1889, and denying appellee dower or homestead in the land mentioned.