## Evans v. Evans.

(Decided Jan. 20, 1933.)

E. B. ANDERSON for appellant.

STOUT & HERDMAN for appellee.

Opinion of the Court by Hobson, Commissioner—
Affirming.

Appellant and appellee were married December 1, 1923. She was forty-four years old, he fifty-seven. On May 20, 1930, he brought this action against her for

divorce; she filed answer denying the allegations of the petition, and praying a divorce and the allowance of alimony. On final hearing the circuit court granted the husband a divorce and dismissed her counterclaim, refusing her alimony, attorney's fee, or cost. She appeals.

In the opinion of the circuit court, the case is fairly stated in these words:

"Plaintiff and defendant were married in Evansville, Indiana, December 1, 1923, and immediately thereafter came to plaintiff's home No. 21 Elm Street, Bowling Green, Kentucky, where they in fact separated May 20, 1930, on which plaintiff filed this suit for divorce, alleging defendant had without fault on his part abandoned him and had arbitrarily refused to cohabit with him for more than five years. August 6, 1930, defendant filed her answer and counterclaim, wherein she denied the material allegations of plaintiff's petition and herself sought a divorce upon the grounds of cruel and inhuman treatment of more than six months duration, which treatment she alleges indicated a settled aversion to her and permanently destroyed her peace and happiness. She further alleged plaintiff, without fault on her part, abandoned her in 1924, though living in the same house, and that this abandonment has continued for more than five years.

"Appropriate replies were filed making up the issues and a great amount of proof was taken by both parties covering their entire married life. After this proof was taken and the case was ready for submission, defendant, on June 2, 1931, offered to file an amended answer and counterclaim wherein she alleged plaintiff, on May 20, 1930, drove her from his home and thus abandoned her; that she and plaintiff have lived separate and apart since said time, and for more than one year. In both her counterclaims, defendant seeks divorce and alimony. Plaintiff objected to the filing of this amended pleading on the ground that all the proof was taken and the case was ready for submission, while defendant contends the amendment was tendered to conform to the proof. The ruling of the Court on the question of filing this amended pleading was passed until the hearing of the case on its

merits. The Court is of the opinion that this amended answer and counterclaim should be filed and an order may be drawn doing so.

"As stated above, the record in this case is quite voluminous and the Court will not attempt to review the evidence, since that would extend this opinion beyond reasonable limits. The record shows plaintiff is now sixty-five years old and at the time of his marriage was a railway mail clerk, earning $2,450.00 per annum, and at that time was worth something like $40,000. This is plaintiff's first marriage. Defendant is now fifty-two years old and was a Mrs. Tinder before her marriage, being a widow without children and owning property to the extent of ten or twelve thousand dollars.

"By the postal regulations, plaintiff would have had to retire January 1, 1932, due to his age, on a pension of $100.00 per month. Due to taking off certain passenger trains by the railroad company, it was necessary for plaintiff to start a new, difficult and long run, which he could have held for a few months. Therefore, he recently retired on his pension of $100.00 per month. At this time plaintiff has no property except his home, worth about $7,500.00 and a business building located on State, in Bowling Green, valued by the various witnesses at sums ranging from $12,500 to $18,000. He owes defendant a note of $5,000 and then has some additional indebtedness of about $1,000 or $1,200.00, which leaves plaintiff's net worth from $15,000 to $20,000. There has been no change in the financial status of the defendant, and she is still worth from ten to twelve thousand dollars.

"About two weeks after their marriage, or in the middle of December 1923, defendant's mother, Mrs. Birk, came to make her home with Mrs. Evans and remained until she died July 28, 1926. She paid her daughter board in the sum of $25.00 per month. After the death of Mrs. Birk, defendant's sister, Mrs. Wolfolk, came in October 1926, to make her home with Mrs. Evans and remained until the final separation in May 1930. Part of this time Mrs. Wolfolk had her two children with her. She paid defendant $20.00 per month room rent and she paid plaintiff $5.00 per week board for each child

while her children were in plaintiff's home. From October 1924, to June 1925, another sister of defendant, Mrs. Ren B. Perkins of Kansas City made her home with plaintiff and his wife, and she brought along her two children.

"Defendant appears to have been extraordinarily devoted to her family and she made numerous and extended visits to her relatives. Mrs. Wolfolk was a widow, yet when any members of the family, or any near friends needed attention, it is rather peculiar that Mrs. Evans was the one who always made the pilgrimages to their aid. In November 1928, Mrs. Evans went to Kansas City and remained ninety days, being absent from her husband both the Thanksgiving and Christmas holidays. In 1930 Mrs. Evans spent Christmas with a niece in Evansville. A railway mail clerk is unusually busy during the Christmas holidays, and if there is ever a time he needs the care and sympathy of a wife it is during the Christmas rush. The record is convincing that Mrs. Evans cared much more for her family than she did for her husband. When a man or woman marries and it becomes necessary to make a choice between the family or the husband or wife, the first duty is to the husband or wife, and our Courts have said this in many opinions. Mrs. Evans never seemed to realize her first duty was to her husband, and not the members of her own family.

"She claims Mr. Evans was penurious and gave her no pin money; was gruff and disagreeable; while he claims Mrs. Evans was extravagant, cold and unresponsive. The record shows Mr. Evans furnished his house nicely, buying about $2,000 worth of furniture; bought an eleven hundred dollar car for his wife; bought for her an electric refrigerator, a radio and vacuum cleaner and supplied her with domestic servant. It is also shown Mrs. Evans collected on the average of $30.00 per month from students occupying the upstairs rooms of the home, besides what she received from members of her family occupying rooms in her home. Also plaintiff paid her $27.50 a month interest on the $5,000 note he owed her. In addition to these figures it shows that during the seven

years plaintiff and defendant lived together she received from roomers and boarders $3,028.50, and $2,117.50 in interest from her husband, or a total of $5,146.00. Yet she complains that she had no pin money. During the seven years of their married life, plaintiff testified his expenditures exceeded his receipts by more than $8,000 and he filed an itemized statement to support his evidence. Whatever may be said of plaintiff, he is not shown to have been penurious. It appears that he had just cause to complain about his nose being kept to the grindstone and that he was being forced into bankruptcy.

"The real question for the court to decide is whether Mrs. Evans or Mr. Evans was at fault in the sexual separation. Mrs. Evans testified Mr. Evans had sexual intercourse frequently until she was operated on for appendicitis, the last of August 1924. Her testimony is to the effect that Thursday before her operation on Sunday Mr. Evans had sexual intercourse with her. She says about a month after the operation and while she was still bandaged Mr. Evans asked her for access to her. She refused him, saying she was not able and his reply was that it would not take long. Then she got up from the bed on which she was lying, saying, 'If that is all the consideration you have for me, I am going in the other room,' and she went into the room where her mother was. She said this was the first and only time she ever refused plaintiff his marital privilege and it infuriated him so he never made another advancement towards her, and from that day his treatment of her was cold, inconsiderate and cruel. Mr. Evans' version of this affair is he did not ask Mrs. Evans to have sexual intercourse with him after the operation in 1924 until along in summer of 1925; that after she refused him he made repeated advancements to her and she refused each and every one of them until he saw that it was no use, and he quit. Here is a sharp contrariety in the evidence. This record shows Mrs. Evans never slept with her husband after she said she refused him. She always slept with some feminine member of her family, giving as an excuse her husband's snores, or that

6

it was not convenient for her to sleep with him. This happened not only at his home, but when they visited in Kansas City and Skillman and on the train in the Pullman. It is most unusual that some incident would not have arisen in the lives of these two persons to have made it necessary for them to have slept together during this interim of over five years. Mrs. Evans says that after she refused Mr. Evans that one time he never made any other advance toward her. It is also contrary to all human experience for a man, after a woman refuses his request one time, never to ask her again. Men ask women sometimes so they can be refused and women sometimes refuse men so they can be asked again, but history does not recite a case where a man asked a woman one time and only one time and upon her refusal lived in the same house with her for more than five years and never asked her again. To show that plaintiff desired to sleep with the defendant, he intended to occupy a Pullman berth with her returning from Kansas City, and she demanded separate berths, saying he snored, and besides she had a canary bird in a cage in her birth with her and there appears to have been no room for the plaintiff.

"The Court is clearly of the opinion the defendant, without right, refused to let her husband enjoy his marital privilege, and it must now be determined whether living under the same roof with his wife, but not sleeping with her for more than five years and not having sexual intercourse with her during that time amounts to an abandonment of him by her."

By section 950-1, Kentucky Statutes, no appeal may be taken to this court from a judgment granting a divorce. The court therefore is without power to disturb the judgment granting the husband a divorce, and the only questions left in the case are as to alimony and costs. The rule is that the court gives considerable weight to the finding of the chancellor in cases of this sort, and does not disturb the finding when the mind is left in doubt as to the truth. The weight of the evidence sustains the chancellor's finding that there was no cohabitation between them for five years before the separation, and that this was the fault of the wife. By

section 2117, Kentucky Statutes, these grounds of divorce are given, "Living apart without any cohabitation for five consecutive years next before the application," and "abandonment by one party or the other for one year."

It is insisted here that this case does not come within the first ground, because the parties in fact lived in the same house, sleeping in different rooms. Section 2121, Kentucky Statutes, provides:

> "Judgment for * * * divorce from bed and board may also be rendered for any of the causes which allow divorce, or for such other cause as the court in its discretion may deem sufficient."

Very clearly here, in any view of the evidence, there was sufficient ground for the court to adjudge the husband a divorce from bed and board, and section 2122 provides:

> "If the wife have not sufficient estate of her own she may, on a divorce obtained by her, have such allowance out of that of her husband as shall be deemed equitable."

Section 900, Kentucky Statutes, provides:

> "In actions for * * * divorce, the husband shall pay the costs of each party, unless it shall be made to appear in the action that the wife is in fault, and has ample estate to pay the same."

Under the facts here, clearly the wife was in fault, and she had ample means; for in addition to the property she has in possession, the court by the judgment required the husband to pay to her the $5,000 he had borrowed from her, with interest. Under the statute the judgment of the court as to alimony and costs would have been just the same if he had granted the husband a divorce from bed and board, and as the judgment for an absolute divorce cannot be complained of in this court, appellant cannot complain on the facts of the judgment refusing alimony and costs. In McQuinn v. McQuinn, 110 Ky. 328, 61 S. W. 358, 360, 22 Ky. Law Rep. 1770, this court thus stated the rule:

> " 'Abandonment,' as used in our statute relative to divorce, has been construed by this court to mean the refusal by the spouse to recognize and contribute to the marital relation for a period of one

8

year, although the parties slept beneath the same roof."

See, also, Evans v. Evans, 93 Ky. 516, 20 S. W. 605, 14 Ky. Law Rep. 628; Axton v. Axton, 182 Ky. 286, 206 S. W. 480; 19 C. J. 58, sec. 111, and cases cited.

Appellant relies on Gates v. Gates, 192 Ky. 253, 232 S. W. 378; but that case rested alone on the ground of "living apart without any cohabitation for five consecutive years next before the application." On the case presented here, the court properly dismissed the wife's counterclaim, with costs, under the other provisions of the statute.

Judgment affirmed.