## Corrigan v. Corrigan et al.

October 28, 1947.

Lawrence F. Speckman, Judge.

696

Arny & Richard for appellant.

Mortimer Viser and Davis, Boehl, Viser & Marcus for appellees.

OPINION OF THE COURT BY JUDGE SILER—Affirming in part, reversing in part.

Mary Marcella Corrigan, appellee, recovered a judgment against Raymond Bernard Corrigan, appellant, for a divorce and for alimony amounting to $40 monthly and for a fee amounting to $300 for her attorneys, now joint appellees herein. Thereupon, the former husband perfected this appeal.

Appellant contends that the divorce should have been granted to him on his counterclaim and that since the chancellor erroneously granted the judgment to Mrs. Corrigan, this court should now reverse that part of the judgment allowing her either alimony or an attorney fee.

Mrs. Corrigan based her suit on a claim of six months cruel and inhuman treatment. The husband, after denying the existence of her claim, based a counterclaim on the ground of Mrs. Corrigan's sexual impotence and malformation and on the ground of her abandonment of him.

These parties made their final separation on December 7, 1945, and they, with the aid of their respective attorneys, executed a formal separation agreement in writing on December 29, 1945. The agreement provided

for payments of $40 to be made monthly by Corrigan to Mrs. Corrigan for her future support, also provided for Mrs. Corrigan to have all the household furniture in their mutual home, also provided for Corrigan to pay the costs, including a $75 fee for her attorney, in any action for divorce that she might institute, also provided for an inclusion of this separation agreement in any judgment that might be rendered in any divorce action between them.

This marriage of the Corrigans began on June 18, 1934, and it continued in effect for nearly 12 years. They are both members of the Catholic faith. No child has ever been born to their union. Corrigan's position with one of the leading Louisville banks pays him a salary of only $220 monthly and therefore this couple has never succeeded in accumulating any property and has continually lived in modest circumstances.

In support of her charge of cruel and inhuman treatment, Mrs. Corrigan produced evidence tending to show that her husband had fallen into the habit of staying out most of the night on many nights, staying out the entire night on some occasions, staying away from home in poker games until late in the night or until early in the morning a few times, staying out long hours at night sometimes and then coming home full of beer, whiskey, raw onions or limburger. Her evidence showed that he would often call and say he was coming home and that he would then fail to arrive. And sometimes, as she stated, she would ask him where he had been and he would, by way of reply, only look at her. These were typical elements and instances of Corrigan's cruel treatment of her and they undoubtedly were, if accepted as true, sufficient to support Mrs. Corrigan's claim for divorce.

On the other hand, the former husband related that although he and Mrs. Corrigan got married 12 years ago, yet they never became one flesh. He said, in substance, that she was as cold as an Arctic snowdrift and that the marriage status between them was continually nominal in character rather than actual. He said that her love, if any, for him was always Platonic and that he was never once able to sell to her the idea of the desirability of a coition with him. He pointed to their

childless condition as evidence sustaining his assertions. He explained that he continued this sexless marriage because he never quite abandoned his illusion of hope for a happier, more successful, future relationship and also because his religious conviction uncompromisingly denounced any thought of a divorcement of this marriage. He furthermore explained that before he ever understood his legal rights under these circumstances and before he had even mentioned Mrs. Corrigan's unwifely attitude of 12 years' standing to his attorney, he had executed their separation agreement which he says should now be vitiated by the court in this litigation.

By way of rebuttal, Mrs. Corrigan categorically, emphatically and repeatedly denied all of the evidence produced by her husband and his witnesses relating to any unwifely attitude on her part at any time. Their marital adventures began, she said, at the rate of three weekly experiences and continued without termination clear into the month of November preceding their final separation in December. And she also produced her own family physician who has examined her, has found her normal, has found every indication that hers has been an average married woman's sex life.

Thus, both the chancellor and this court have been faced with very conflicting evidence in this case relating to the serious questions at issue. She alleged and sufficiently proved a cause of divorce. He alleged but did not prove his malformation-impotence charge against her, but he did allege and also proved an abandonment charge against her, because this court has held that a renunciation of the true, normal, regular marital relationship by one spouse against the other constitutes an abandonment under the divorce law. See Evans v. Evans, 247 Ky. 1, 56 S. W. 2d 547; McQuinn v. McQuinn, 110 Ky. 321, 328, 61 S. W. 358.

But now the husband wants us, in dealing with this alimony question, to accept his story and to reject hers pertaining to this marriage relationship. To do this would have the effect of confirming as a normal probability the continuation by a husband for more than a decade in a marriage that was never anything but a sort of mockery. And yet, we are bound to realize that

a 12 year continuity of such a situation would be contrary to all the natural probabilities. In marriage or even in a mere cohabitation without marriage, conjugal love has a very great cohesive power. Platonic love has none. King Solomon had 700 wives and he "clave unto these in love," but he would certainly have walked out on the whole bunch before breakfast had they renounced normal conjugality with him. Julius Caesar happily cohabited with Cleopatra, but he doubtless would have turned a sour face upon the Egyptian palace in short order had she sent him out to the barn to find a bed. Old man Franklin, Benjamin's father, sired and reared 17 children while living with Mrs. Franklin, but the world might still be groping around in the darkness of an unelectrified age, deprived of all the richness of that kite flyer's great life, had his mother merely lectured on Platonic love to her husband, because Mr. Franklin, under such conditions, would perhaps have caught a fast schooner for Georgia in search of some buxom belle with the sultry emotions of the deep south. Continuity of marriage for 12 years or 2 years or even 1 year without a coition of the parties is so abnormal, unnatural and improbable that we must consider that the chancellor was fully justified in rejecting this husband's evidence that this marriage lasted 12 *long* years in absolute continence.

Before reaching the end of this case, we must consider the validity and effect of the separation contract made by these parties on December 29, 1945, following their separation on December 7, 1945. The chancellor adopted and followed this contract in all details except the one providing for a payment of a $75 fee to Mrs. Corrigan's attorney, this being increased to $300 by the chancellor on the theory that the contractual fee of $75 was fixed by the parties strictly in contemplation that the divorce would not be contested by Corrigan.

Corrigan says that this entire contract is invalid because he did not understand his legal rights. The chancellor thought that he did. We feel that we must agree with the chancellor because the facts and circumstances appear to sustain his viewpoint in this respect. Corrigan was a mature man, was holding a responsible position, was fairly well educated, was represented by a skillful attorney with whom Corrigan had every oppor-

tunity for such an inter-communication as to enable the one to receive all the facts and to enable the other to receive all legal advice pertaining to those facts.

Corrigan also says that this entire contract is invalid because it is one that was made to facilitate the procurement of divorce and that it is accordingly contrary to public policy. The chancellor thought that the contract was not one made to facilitate the procurement of divorce nor one antagonistic to public policy. Those views of the chancellor are, we think, fully justified by the law as it has been written. Where the parties are already in separation, which was the precise situation of the Corrigans, an alimony or property agreement, if fair on its face, will be upheld in a subsequent divorce action. See 9 R. C. L. 524; Hoskins v. Hoskins, 201 Ky. 208, 256 S. W. 1.

However, if we are going to say that this contract of the Corrigans is within the approbation of public policy, this being the viewpoint adopted by the chancellor and now concurred in by this court, we must go somewhat further and also say that it is *not* the kind of a contract that ever contemplated that Corrigan might cooperate to any extent whatever in any divorce action possibly to follow later. When these parties made this valid contract and placed it within the bounds of sound public policy and provided for a $75 attorney fee for Mrs. Corrigan's attorney, everyone had to understand that there might or might not be any divorce action whatever but that in event divorce litigation did ensue, Corrigan would then have the full privilege to fight it rather than to facilitate it, to defend it like an Irishman rather than merely to accept it like "Mr. Milquetoast." Mrs. Corrigan and her attorney had to take their chance, we think, on the possibility that Corrigan would fully assert all his legal rights from "hell to breakfast," as the saying goes, in any divorce action. Otherwise, the separation agreement was one contrary to public policy. If this contract is valid, its provisions are all binding and effective from A to Izzard. If this contract is consistent with public policy, its provision for a $75 attorney fee must be respected and honored as the bargain of these parties and as one to be upheld by legal sanction. Since the chancellor declined to uphold the $75 attorney fee provision of this

contract while upholding its other provisions, we believe that the judgment will have to be reversed to that extent so that there may be a full compliance with every part of this contract just as it was executed by the parties.

Wherefore, the judgment is affirmed in part and reversed in part for further proceedings consistent with this opinion.